CHARLES F. SWEETMAN, JR. *v.* STATE ELECTIONS ENFORCEMENT COMMISSION
(SC 15919)

BOARD OF EDUCATION OF REGIONAL SCHOOL DISTRICT NUMBER 17 ET AL. *v.* STATE ELECTIONS ENFORCEMENT COMMISSION
(SC 15920)

Callahan, C. J., and Borden, Berdon, Palmer and Ronan, Js.

Argued January 13—officially released June 22, 1999

*John C. Yavis, Jr.*, with whom were *Kari L. Olson* and, on the brief, *Joseph P. Fasi*, for the appellant in the first case (plaintiff Charles F. Sweetman, Jr.).

*Charles L. Howard*, with whom were *Sheila A. Huddleston* and, on the brief, *Alisa N. Fay*, for the appellants in the second case (plaintiff board of education of Regional School District Number 17 et al.).

*Gregory T. D'Auria*, assistant attorney general, with whom were *Jeffrey Garfield, Joan Andrews* and, on the brief, *Richard Blumenthal*, attorney general, and *Carolyn K. Querijero*, assistant attorney general, for the appellee in both cases (defendant state elections enforcement commission).

*Patrice McCarthy* and *Joan G. Libby* filed a brief for the Connecticut Association of Boards of Education et al. as amici curiae.

*Opinion*

BERDON, J. This consolidated appeal calls upon us to resolve a number of issues surrounding the expenditure of public funds by the plaintiffs, the board of education of Regional School District Number 17 (board), certain individual members of the board, and Charles F. Sweetman, Jr., the superintendent and chief executive officer of the board (collectively, the plaintiffs).[1] In broad strokes, the plaintiffs used public funds to print and distribute a pamphlet discussing an upcoming referendum on the budget that the board had proposed (pamphlet). The defendant, the state elections enforcement commission (commission), determined that this pamphlet improperly advocated an affirmative vote on the referendum in violation of General Statutes § 9-369b.[2]

[1] In addition to the board and Sweetman, the plaintiffs in these consolidated actions are: Helen Reeve, Jeannetta V. Coley, Robert H. Lentz, Robert J. Bilafer, Edward A. Vynalek, Anne E. Wolak, Rebecca L. Bergeron, Michael F. Dagostino, Robert S. Daves and James E. Sheppard.

[2] General Statutes § 9-369b provides: "Explanatory text relating to local questions. Expenditure of state and municipal funds to influence vote prohibited. Exception. Civil penalty. Summaries of arguments for, against local questions. (a) Any municipality may, by vote of its legislative body, authorize the preparation and printing of concise explanatory texts of local proposals

## Accordingly, the commission directed the plaintiffs to

or questions approved for submission to the electors of a municipality at a referendum. Thereafter, each such explanatory text shall be prepared by the municipal clerk, subject to the approval of the municipal attorney, and shall specify the intent and purpose of each such proposal or question. Such text shall not advocate either the approval or disapproval of the proposal or question. The municipal clerk shall cause such question or proposal and such explanatory text to be printed in sufficient supply for public distribution and shall also provide for the printing of such explanations of proposals or questions on posters of a size to be determined by said clerk. At least three such posters shall be posted at each polling place at which electors will be voting on such proposals or questions. Any posters printed in excess of the number required by this section to be posted may be displayed by said clerk at his discretion at locations which are frequented by the public. The explanatory text shall also be furnished to each absentee ballot applicant pursuant to subsection (d) of section 9-140. Except as provided in subsection (c) of this section, no expenditure of state or municipal funds shall be made to influence any person to vote for approval or disapproval of any such proposal or question. This subsection shall not apply to a written, printed or typed summary of an official's views on a proposal or question, which is prepared for any news medium or which is not distributed with public funds to a member of the public except upon request of such member.

"(b) The State Elections Enforcement Commission, after providing an opportunity for a hearing in accordance with chapter 54, may impose a civil penalty on any person who violates subsection (a) of this section by authorizing an expenditure of state or municipal funds for a purpose which is prohibited by subsection (a). The amount of any such civil penalty shall not exceed twice the amount of the improper expenditure or one thousand dollars, whichever is greater. In the case of failure to pay any such penalty imposed under this subsection within thirty days of written notice sent by certified or registered mail to such person, the superior court for the judicial district of Hartford, on application of the commission, may issue an order requiring such person to pay the penalty imposed. Notwithstanding the provisions of sections 5-141d, 7-101a and 7-465, any other provision of the general statutes, and any provision of any special act or charter, no state or municipal officer or employee shall be indemnified or reimbursed by the state or a municipality for a civil penalty imposed under this subsection.

"(c) Any municipality may provide, by ordinance, for the preparation and printing of concise summaries of arguments in favor of, and arguments opposed to, local proposals or questions approved for submission to the electors of a municipality at a referendum for which explanatory texts are prepared under subsection (a) of this section. Any such ordinance shall provide for the establishment or designation of a committee to prepare such summaries, in accordance with procedures set forth in said ordinance. The members of said committee shall be representatives of various viewpoints concerning such local proposals or questions. The committee shall provide

(1) "strictly comply" with § 9-369b and (2) reimburse the district for $2573.68, the cost of printing and mailing the pamphlet. In addition, the commission imposed a civil penalty of $1000 on Sweetman. The trial court dismissed the plaintiffs' appeals from these orders.[3] We decline the plaintiffs' invitation to disturb this ruling.

The commission found the following facts. "By letter dated June 8, 1996 . . . [a] complainant requested that the [commission] investigate [the pamphlet, which was] mailed to households in Regional School District No. 17 [district] at public expense by the [board] in April [of] 1996 concerning an upcoming referendum . . . ." The complainant alleged a violation of § 9-369b (a), which prohibits the "expenditure of state or municipal funds . . . to influence . . . vote[s] . . . ."[4]

The district "is solely comprised of the towns of Haddam and Killingworth. . . . [A]t all times relevant to this [appeal], the [board] was comprised of the following ten members: Helen Reeve, Jeannetta U. Coley, Robert H. Lentz, Robert J. Bilafer, Edward A. Vynalek, Anne E. Wolak, Rebecca L. Bergeron, Michael F. Dagostino, Robert S. Daves and James E. Sheppard. . . . [T]he town of Haddam has six members and the town of Killingworth has four members on [the] board, in accordance with each town's percentage of population in the total district."

"[A]ll members of the board are members of the budget subcommittee." This subcommittee "met on February 29, 1996, with . . . Reeve, Lentz, Coley, Sheppard,

an opportunity for public comment on such summaries to the extent practicable. Such summaries shall be approved by vote of the legislative body of the municipality, or any other municipal body designated by the ordinance, and shall be posted and distributed in the same manner as explanatory texts under subsection (a). Each summary shall contain language clearly stating that the printing of the summary does not constitute an endorsement by or represent the official position of the municipality."

[3] Although Reeve was a plaintiff in the underlying action, she elected not to appeal from the commission's orders.

[4] For the full text of § 9-369b, see footnote 2 of this opinion.

Wolak and Sweetman present, and discussed the . . . [pamphlet]. . . . [T]he budget subcommittee of the board met again on April 4, 1996, with . . . Reeve, Lentz, Coley, Bergeron, Daves, and Vynalek present, and discussed the [pamphlet]." "[A]t its April 9, 1996 meeting, the [board] voted to adopt the legal call for the district['s] annual meeting on May 6, 1996, and to set the voting hours for a referendum on the budget for May 7, 1996. . . . [T]he budget subcommittee of the board met on April 16, 1996, with . . . Reeve, Lentz, Bilafer and Sweetman present, [and] discussed, finalized and approved the [pamphlet] for distribution to households in the district. . . .

"[T]he format of the [pamphlet was] based upon that of previous flyers, including an introductory letter authored by . . . Lentz as budget chairman. The introductory letter went through several drafts, and in response to [the] suggestion that it was too strong, a specific exhortation to vote for the budget was removed from the first draft. . . .

"[B]y letter dated April 18, 1996 . . . Sweetman sent the completed budget [pamphlet] to . . . Reeve, chair of the board, disavowed any responsibility for the [pamphlet] and indicated that it would be sent to the printer no later than April 19, 1996 unless she instructed him otherwise. . . . Neither the [board] nor [Sweetman] had the [pamphlet] reviewed by an attorney prior to its mailing. . . .

"[P]rior to the referendum vote on May 7, 1996, the approximately 4800 households within the district received the twelve page [pamphlet], which included charts, graphs, a question and answer section, and statements such as: 'We need to set aside monies for such basic capital improvements as roof and oil tank replacement and black top resurfacing. . . . It is imperative to maintain our facilities. . . . Please think for a

minute of your own budget over the last few years. Have you or your friends had an increase in income to keep pace with inflation? If not, how did you or they cope? What did you cut or adjust? . . . [W]e on the board are faced with the same realities. . . . We look forward to a high turnout at the polls. We need voter participation to validate our educational priorities and directions. . . . [T]he budget [pamphlet] cost $1950 to print and $623.68 to mail, and such printing and distribution was at the expense of the school district."

Based upon its independent review of the pamphlet, the commission concluded that, "taken as a whole, [the pamphlet] advocates an affirmative referendum vote. It was issued days before the referendum was held and repeatedly refers to the referendum, the difficulty the district experienced with a zero percent budget increase the previous year and the need for repairs and maintenance of school facilities. It further states that 'in recommending this budget, the [board] is attempting to strengthen the District's present level of education' and encourages voter turnout to 'validate *our* educational priorities.' . . . [T]aken as a whole, the [pamphlet] has the effect of influencing a person to vote in favor of the referendum." (Emphasis added.) The commission further concluded that the board "approved the [pamphlet] for printing and distribution, and that [Sweetman] is administratively and professionally responsible for sending the [pamphlet] to households within the district." Accordingly, the commission found that the "board, its individual members, and [Sweetman] violated [§ 9-369b] by authorizing the expenditure of municipal funds to prepare, reproduce, and distribute the [pamphlet]." The commission characterized this violation as "a serious offense."

With respect to Sweetman's responsibility for distributing the pamphlet, the commission explained that he had previously "taken decisive action to stop the board

from committing what he felt would be a violation of the General Statutes (the freedom of information laws) by locking them out of a designated meeting place." Moreover, the commission emphasized that Sweetman was "under prior order of the commission to ensure the district's compliance with [§ 9-369b], pursuant to two prior cases . . . ."[5]

With respect to the board's responsibility for distributing the pamphlet, the commission explained that "seven of the ten present board members were board members at the time the Commission approved [a] consent agreement and order with . . . Sweetman [consent order].[6] . . . The board members were: Helen Reeve, James E. Sheppard, Robert J. Bilafer, Robert S. Daves, Edward A. Vynalek, Anne E. Wolak and Michael F. Dagostino. . . . [I]n October [of] 1995, board members were informed of the consent [order] by the then chairman in a board meeting, and by press release distributed to board members. A copy of the consent agreement and order itself was distributed to the four board officers, which at the time included . . . Bilafer and Sheppard. . . . Board members' testimony to the

[5] The commission excerpted the following passages from these prior orders: " '[Sweetman] shall henceforth ensure that equipment or supplies of the school district not be used to prepare or reproduce *any printed communication* which advocates a position on a referendum, except as specifically authorized by [§ 9-369b].' Complaint of Richard Zanelli, File No. 91-150. . . .

" 'It is hereby ordered that [Sweetman] pay to the commission a civil penalty of Six Hundred Dollars ($600.00) on or before October 16, 1995, and [that] the [board] shall not distribute *any information* concerning a referendum vote without the approving opinion of counsel that such distribution is not in violation of [§ 9-369b].' Complaint of Philip Evans, File No. 95-219. . . ." (Emphasis in original.) The commission emphasized that "[t]he latter order was entered by the Commission with the written consent of . . . Sweetman."

The commission concluded that, "by distributing the [pamphlet] without obtaining an approving opinion of counsel that [it] would not be in violation of [§ 9-369b], Sweetman violated the Commission's prior order[s] . . . ."

[6] See footnote 5 of this opinion.

contrary that they were unaware of the [consent order] is improbable, at best.

"It is found that . . . Sweetman and the seven board members identified . . . above, have not demonstrated good faith in attempting to comply with the provisions of [§ 9-369b]."

Based upon the foregoing findings and conclusions, the commission issued the following order: "1. The [plaintiffs] shall henceforth strictly comply with the prohibition in [§ 9-369b] and shall ensure that no expenditure of municipal funds shall be made to influence any person to vote for approval or disapproval of a referendum question.

"2. The [plaintiffs] shall henceforth not distribute any information concerning a referendum vote without the approving opinion of counsel that such distribution is not in violation of [§ 9-369b].

"3. . . . Robert H. Lentz, Jeannetta U. Coley and Rebecca L. Bergeron are reprimanded for the above-cited violation of [§ 9-369b].

"4. . . . Sweetman and the . . . board members who served on the board at the time the consent agreement and order were adopted . . . shall reimburse the district for the cost of the printing and distribution of the [pamphlet], $2573.68, to be allocated equally among such eight individual [plaintiffs]. Helen Reeve, James E. Sheppard, Robert J. Bilafer, Robert S. Daves, Edward A. Vynalek, Anne E. Wolak, Michael F. Dagostino, and Charles F. Sweetman, Jr., shall each remit the amount of three hundred and twenty-one dollars and seventy-one cents ($321.71) to the district within thirty days of the adoption of the final decision in this matter.

"5. [Sweetman] shall remit an additional civil penalty in the amount of one thousand dollars ($1000.00) to

the commission within thirty days of the adoption of the final decision in this matter."

Sweetman and the board brought separate administrative appeals from this order. The trial court dismissed these appeals, except as to Dagostino.[7] Sweetman appealed to the Appellate Court, as did the board and all of its individual members except Reeve. We transferred the consolidated appeals to this court pursuant to Practice Book § 4023, now § 65-1, and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

I

SECTION 9-369b APPLIES TO REGIONAL
SCHOOL DISTRICTS

As a threshold matter, the plaintiffs argue that they could not possibly have violated § 9-369b, because the statute does not apply to regional school districts. We are not persuaded.

"The standard of review of an agency decision is well established. 'Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to

---

[7] The court sustained Dagostino's appeal and ordered a remand to the commission for a pro rata recalculation that excluded him. The commission does not challenge this ruling. Accordingly, Dagostino is not a party before this court.

judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law. . . . *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, 243 Conn. 635, 642–43, 708 A.2d 202 (1998)." (Internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, 244 Conn. 378, 389, 709 A.2d 1116 (1998). Because our courts have not yet had occasion to construe the language of § 9-369b, our standard of review is plenary.

The plaintiffs argue that the requirements imposed by § 9-369b do not apply to regional boards of education; the commission disagreed. In resolving this dispute over the proper construction of the statute, "our fundamental objective . . . is to ascertain and give effect to the apparent intent of the legislature; *Fleming* v. *Garnett*, 231 Conn. 77, 91–92, 646 A.2d 1308 (1994); *State* v. *Metz*, 230 Conn. 400, 409, 645 A.2d 965 (1994); we will not undertake an examination of [§ 9-369b] with blinders on regarding what the legislature intended [it] to mean. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). Accordingly, our analysis of [§ 9-369b] is not limited solely to the words of the statute. Instead, we must also look . . . to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. *State* v. *Metz*, supra, 409; *Fleming* v. *Garnett*, supra, 92. . . . *Derwin* v. *State Employees Retirement Commission*, 234 Conn. 411, 420, 661 A.2d 1025 (1995) . . . ." (Citation omitted; internal quotation marks omitted.) *Doe* v. *Marselle*, 236 Conn. 845, 850–51, 675 A.2d 835 (1996).

"In interpreting a statute, 'common sense must be used . . . .' *Norwich Land Co.* v. *Public Utilities Commission*, 170 Conn. 1, 4, 363 A.2d 1386 (1975)." *Buckley*

v. *Warden*, 181 Conn. 286, 290, 435 A.2d 348 (1980); accord *Cannata* v. *Dept. of Environmental Protection*, 239 Conn. 124, 141, 680 A.2d 1329 (1996); *Trumbull* v. *State*, 206 Conn. 65, 80, 537 A.2d 431 (1988) ("[c]ommon sense . . . is a highly significant guide to statutory interpretation"). "The law favors rational and sensible statutory construction. . . . The unreasonableness of the result obtained by the acceptance of one possible alternative interpretation of an act is a reason for rejecting that interpretation in favor of another which would provide a result that is reasonable. . . . When two constructions are possible, courts will adopt the one which makes the [statute] effective and workable, and not one which leads to difficult and possibly bizarre results. . . . *Maciejewski* v. *West Hartford*, 194 Conn. 139, 151–52, 480 A.2d 519 (1984). We consider the statute as a whole with a view toward reconciling its parts in order to obtain a sensible and rational overall interpretation. *Fruin* v. *Colonnade One at Old Greenwich Ltd. Partnership*, 237 Conn. 123, 130, 676 A.2d 369 (1996). We have long followed the guideline that [t]he intent of the lawmakers is the soul of the statute, and the search for this intent we have held to be the guiding star of the court. It must prevail over the literal sense and the precise letter of the language of the statute. . . . When one construction leads to public mischief which another construction will avoid, the latter is to be favored unless the terms of the statute absolutely forbid [it]. . . . *Bridgeman* v. *Derby*, 104 Conn. 1, 8, 132 A. 25 (1926)." (Internal quotation marks omitted.) *State* v. *Anonymous*, 237 Conn. 501, 514–15, 680 A.2d 956 (1996); accord *State Board of Labor Relations* v. *Freedom of Information Commission*, 244 Conn. 487, 495, 709 A.2d 1129 (1998) ("Statutes are to be construed in a manner that will not thwart [their] intended purpose or lead to absurd results. . . . The law favors a rational

statutory construction and we presume that the legislature intended a sensible result." [Citation omitted; internal quotation marks omitted.]); *Board of Education* v. *State Board of Education*, 243 Conn. 772, 782, 709 A.2d 510 (1998) ("[i]f a statute can be construed in several ways, we will adopt the construction that is most reasonable").

We begin with the language of § 9-369b.[8] One portion of the statute's caption provides that "[e]xpenditure of state and municipal funds to influence vote[s] [is] prohibited." Section 9-369b (a) provides in pertinent part that "[a]ny municipality may, by vote of its legislative body, authorize the preparation and printing of concise *explanatory* texts of local proposals or questions approved for submission to the electors of a municipality at a referendum. Thereafter, each such explanatory text shall be prepared by the municipal clerk, subject to the approval of the municipal attorney, and shall specify the intent and purpose of each such proposal or question. Such text *shall not advocate* either the approval or disapproval of the proposal or question. . . . Except as provided in subsection (c) of this section, *no expenditure of state or municipal funds shall be made to influence any person* to vote for approval or disapproval of any such proposal or question. . . ." (Emphasis added.)

Section 9-369b (b) authorizes the commission to "impose a civil penalty on *any person* who violates subsection (a) of this section by authorizing an expenditure of state or municipal funds for a purpose which is prohibited by subsection (a). . . ."[9] (Emphasis added.)

Finally, § 9-369b (c) creates a carefully circumscribed mechanism by which a municipality may use public

[8] For the full text of § 9-369b, see footnote 2 of this opinion.

[9] The amount of the penalties imposed in the present appeal comports with the limitations set forth in § 9-369b (b), and is not challenged by the plaintiffs.

funds for advocacy. In essence, public officials may prepare and distribute concise pro/con summaries pertaining to local proposals or questions.

The plaintiffs argue that this language does not include regional boards of education. More specifically, they contend that, because a regional board of education is not a "municipality," § 9-369b does not apply to them.[10] This contention disregards several aspects of the statute's broad language. First, it disregards a portion of the statute's caption: "Expenditure of state and municipal funds to influence vote[s] prohibited." It similarly disregards the last line of subsection (a), which provides that "no expenditure of state or municipal funds shall be made to influence any person . . . ." General Statutes § 9-369b (a). As a matter of basic syntax, the use of the passive voice in these two prohibitions does not limit the statute to any particular entity, let alone to municipalities. This syntactical inference finds concrete support in subsection (b), which authorizes the commission to "impose a civil penalty on *any person* who violates subsection (a) of this section by authorizing an expenditure of state or municipal funds for a purpose which is prohibited by subsection (a)." (Emphasis added.) General Statutes § 9-369b (b). The statute thus focuses on the individual who expends public funds, not the governmental entity with which that individual is affiliated. Accordingly, the plaintiffs cannot evade liability on the ground that the district is not a "municipality."

Although the statute is not limited to municipalities, it is not without internal limitations. The commission is only authorized to impose penalties on persons who

---

[10] General Statutes § 9-1 (i) defines municipality as "any city, borough or town within the state." The commission does not dispute that a school district is not a city, a borough, or a town. At oral argument, however, the plaintiffs conceded that § 9-369b does apply to local boards of education, even though such boards are not cities, boroughs, or towns.

violate § 9-369b by (1) using municipal funds to disseminate information that pertains to (2) a local proposal or question approved for submission to the electors of a municipality at a referendum. The plaintiffs maintain that they did not expend municipal funds, and that the referendum was not a local proposal or question. We are not persuaded on either count.

The plaintiffs argue that, "[o]nce funds are received by the regional school district—from whatever source—they become the funds of the regional school district. They are no longer municipal funds." The plaintiffs have supplied no reason in law or logic in support of this notion of fiscal transubstantiation, and we are unable to discern any. By definition, regional school districts are composed of two or more municipalities. They are funded by municipal tax dollars.[11] It is clear that § 9-369b focuses upon the fact that the relevant funds are municipal, irrespective of the nature of the entity that is responsible for expending those municipal funds. Accordingly, we conclude that the money that the district received and the plaintiffs expended consisted of municipal funds.

The plaintiffs also contend that "§ 9-369b applies exclusively to proposals or questions submitted to 'electors of *a* municipality,' " as opposed to electors of multiple municipalities. (Emphasis in original.) This contention is also without merit. The proposal was submitted to the voters of each municipality; each voter was an "electo[r] of a municipality." It is of no moment

---

[11] General Statutes § 10-51 (b) provides in pertinent part: "[E]ach town in the district shall pay a share of the cost of capital outlay and current expenditures necessary for the operation of the district. The board shall determine the amount to be paid by each member town. Such amount shall bear the same ratio to the net expenses of the district as the number of pupils resident in such town in average daily membership in the regional school district during the preceding school year bears to the total number of such pupils in all the member towns . . . ."

that these electors happened to occupy two different municipalities, or that these two municipalities constitute a regional school district.

In addition, the plaintiffs argue that "[t]he proposed district budget . . . is not a *local* proposal or question [contemplated by § 9-369b], but a *regional* proposal or question; it affects residents in more than one municipality." (Emphasis in original.) This distinction between local and regional proposals finds no support in the text of either § 9-369b or any other statute that the plaintiffs have called to our attention. For purposes of § 9-369b, the antonym of "local" is not "regional." Rather, the relevant antonym is "state." See, e.g., General Statutes § 10-220 (b) (distinguishing "educational goals for . . . local or regional school district[s]" from "state-wide goals"). In other words, the proposal was "local" as that term is used in § 9-369b—as opposed to statewide—because it involved the voters of only two municipalities. The fact that the proposal could also be characterized as "regional" neither prevents the proposal from being local nor exempts the plaintiffs from complying with the requirements set forth in the statute.

Like the text of § 9-369b, the legislative history surrounding its enactment contains no support for the plaintiffs' theory that they are exempt from the requirements of the statute. The title of the legislation is revealing: "An Act Concerning Enforcement of the Prohibition Against the Use of Public Funds to Advocate a Position on a Referendum Question." 32 H.R. Proc., Pt. 15, 1989 Sess., p. 4938. Significantly, this title does *not* contain the limitation upon which the plaintiffs rely so heavily: it embraces all *public* funds, and is not limited to the funds of one municipality. In the course of his remarks on the floor of the House of Representatives, Representative William A. Kiner—the proponent of the act—

made countless references to "taxpayer money."[12] In addition, Representative Mae S. Schmidle explained that § 9-369b forbids an "extraordinary expenditure of public funds to resolve an issue that all the taxpayers have a stake in . . . ." Id., pp. 4957–58. Nowhere did any legislator either state or imply that "municipal funds" exclude tax revenue expended by a regional school district. Rather, the legislature's concern was that "the government will not take sides on a particular side of the issue and spend [taxpayer] money" to do so. Id., p. 4957, remarks of Representative Schmidle.

The exemption that the plaintiffs seek would undermine this clear policy statement. It makes no sense to permit officers of regional boards of election to expend taxpayer money to advocate a result in an upcoming referendum. No other public official possesses this power, and there is no rational basis for bestowing it upon members of regional boards of education. Our common sense tells us that the legislature could not have intended to enact a law that applied to "any person" except for multidistrict boards. Accordingly, we agree with the commission that "the public policy embodied in [§ 9-369b], prohibiting the use of public funds to advocate a position on a referendum question, would be entirely thwarted by the [plaintiffs'] suggested interpretation, and would lead to a bizarre result by

---

[12] For examples of Representative Kiner's references, see 32 H.R. Proc., supra, p. 4939 ("[an] official has the right to advocate to his heart's content, so long as he does not use taxpayer dollars to do so"); id., p. 4941 (press releases may not be sent out "at taxpayers' expense"); id., p. 4943 (§ 9-369b applies to "[a]ny kind of referendum where there is . . . a vote and where . . . tax dollars could be spent to advocate for or against"); id., p. 4944 ("[i]f there is any expenditure of moneys at all, these moneys cannot be taxpayer dollar moneys"); id., p. 4947 ("taxpayer dollars cannot be used to advocate"); id., p. 4949 ("[t]he intent is not to use taxpayer dollars to convince voters to vote for or against"); id., p. 4954 ("[t]his bill in no way precludes [an] elected official . . . from advocating, so long as he doesn't use the taxpayer dollars to do that"); id., p. 4956 ("where [there are] expenditures of money involved . . . to advocate . . . taxpayer dollars [can] not be used").

permitting regional school district boards of education . . . to engage in an activity which other boards of education and municipal officials are prohibited from engaging in." Because we presume that the legislature acted rationally and sensibly, we are unwilling to endorse the plaintiffs' construction of § 9-369b. The legislature intended to prohibit expenditure of taxpayer money to influence local referenda; we decline the plaintiffs' invitation to frustrate this purpose.

The plaintiffs themselves concede that, "philosophically," it makes no sense to exclude regional boards of education from the scope of § 9-369b. The plaintiffs nevertheless posit two reasons why the legislature theoretically might have chosen to distinguish between regional and local school districts. Neither reason is persuasive. First, the plaintiffs cite the "fiscal autonomy of regional school districts." Section 9-369b, however, clearly regulates the conduct of fiscally autonomous entities, provided they expend municipal funds. Second, the plaintiffs assert that "significant statutory differences between votes on regional school district budgets and municipal budgets" justify differential treatment under § 9-369b. The plaintiffs do not, however, support this assertion by indicating any differences that are material for purposes of § 9-369b, and we are unable to discern any.[13]

---

[13] The plaintiffs observe that "[r]egional school districts operate independently of their constituent towns, and no single town clerk or town attorney has jurisdiction over a whole regional school district. Thus, no [single] official has authority to prepare or review the text as required in § 9-369b." This observation does not avail the plaintiffs. First, this distinction does not affect the fact that the statute prohibits "any person" from authorizing a prohibited expenditure of state or municipal funds. Moreover, the plaintiffs do not deny that each constituent municipality could independently fulfil the requirements set forth in the statute. At oral argument, the plaintiffs warned that different communities might distribute different information. The possibility that the electorate would have access to multiple perspectives does not strike us as an evil to be avoided.

The plaintiffs have expressed their fear that "§ 9-369b has a chilling effect on the . . . speech of public officials . . . ." This is simply not true. The statute does not prohibit public officials from speaking; it merely prohibits them from using the public fisc to purchase a soap box. The statute itself provides two mechanisms by which public officials may make their views known: (1) the statute authorizes concise pro/con statements; and (2) the statute contains an exemption for press releases "prepared for any news medium" or distributed with public funds to those members of the public who request it.[14] There is, of course, nothing in the statute to prevent public officials from either (1) using their own personal funds to advocate or (2) establishing political committees to pay for advertising and/or distributing communications. As Representative Kiner, the proponent of the act, put it on the floor of the House, an "official has the right to advocate to his heart's content, so long as he does not use taxpayer dollars to do so . . . ." 32 H.R. Proc., supra, p. 4939.

Finally, the interrelationship among § 9-369b and other legislation lends further support to our conclusion that the statute applies to public funds expended by regional boards of education. Most significantly, General Statutes § 10-47 provides in pertinent part that "[r]egional boards of education shall have all of the powers *and duties* conferred upon boards of education by the general statutes . . . ." (Emphasis added.) Pursuant to § 9-369b, one of these duties is to refrain from using municipal funds to influence the outcome of a referendum. At oral argument before this court, the plaintiffs conceded that local boards of education have this duty. It follows that regional boards of education have the identical duty.[15]

---

[14] For the full text of § 9-369b, see footnote 2 of this opinion.

[15] This conclusion comports with General Statutes § 10-53 ("[a]ll provisions of the general statutes relating to public education . . . shall apply to each town belonging to a regional school district") and General Statutes

## II

## THE COMMISSION'S STATUTORY CONSTRUCTION IS NOT A REGULATION

The plaintiffs contend that the commission relied upon an illegal regulation. We disagree.

On August 7, 1991, the commission released a decision adjudicating a complaint concerning, inter alia, an allegation that a mailing prepared and disseminated at municipal expense contained improper advocacy pertaining to an upcoming budget referendum. Complaint of Huguet Pameijer, File No. 91-154 (Pameijer decision). Interpreting the plain meaning of § 9-369b, the commission explained in its memorandum of decision that advocacy consists of "words explicitly urging voters to vote in a particular manner on the referendum." In evaluating a given text, the commission stated that it "review[s] the entire communication and carefully consider[s] the style, tenor and timing of the communication to determine whether it advocates a position on a pending referendum."

Shortly thereafter—and in response to "a considerable number of inquiries from local officials and citizens"—Jeffrey B. Garfield, the executive director of the commission, distributed a memo to all of the state's superintendents of schools (Garfield memo). This memo recites the standard articulated in the Pameijer decision: "A communication advocates a position on a referendum when in part, or taken as a whole, it urges the listener or reader to vote in a particular manner. The style, tenor and timing of a communication are factors which are considered by the commission when reviewing alleged improprieties [under] section 9-369b."[16]

§ 10-220 (explaining duties of local and regional boards of education without distinguishing between the two).

[16] To be perfectly clear, the commission explained in the Pameijer decision that advocacy consists of "urging [the listener or reader] to vote in a particu-

The plaintiffs claim that the commission's resolution of the present appeal is fatally infected by its reliance upon the Garfield memo. The commission does not deny that the Garfield memo did not comply with the procedures associated with promulgating a valid regulation.[17] Instead, the commission maintains that the sum-

---

lar manner" on an upcoming referendum, and explained that the commission reviews the entire communication and carefully considers "the style, tenor and timing of [a] communication" to determine whether it advocates a position. The language in quotation marks appears verbatim in the Garfield memo. In functional terms, therefore, distributing the Garfield memo was indistinguishable from distributing copies of the Pameijer decision. The plaintiffs concede that "some of the [Garfield memo] may have derived from decisions in contested cases."

[17] See, e.g., General Statutes § 4-168 (a), which provides in pertinent part: "[A]n agency, prior to adopting a proposed regulation, shall: (1) Give at least thirty days' notice by publication in the Connecticut Law Journal of its intended action. The notice shall include (A) either a statement of the terms or of the substance of the proposed regulation or a description sufficiently detailed so as to apprise persons likely to be affected of the issues and subjects involved in the proposed regulation, (B) a statement of the purposes for which the regulation is proposed, (C) a reference to the statutory authority for the proposed regulation and (D) when, where and how interested persons may present their views on the proposed regulation; (2) give notice by mail to each joint standing committee of the General Assembly having cognizance of the subject matter of the proposed regulation; (3) give notice by mail to all persons who have made requests to the agency for advance notice of its regulation-making proceedings. The agency may charge a reasonable fee for such notice based on the estimated cost of providing the service; (4) provide a copy of the proposed regulation to persons requesting it. The agency may charge a reasonable fee for copies in accordance with the provisions of section 1-212; (5) following publication of the notice in the Connecticut Law Journal, prepare a fiscal note, including (A) an estimate of the cost or of the revenue impact on the state or any municipality of the state and (B) if applicable, the regulatory flexibility analysis prepared under section 4-168a. The governing body of any municipality, if requested, shall provide the agency, within twenty working days, with any information that may be necessary for analysis in preparation of such fiscal note; (6) afford all interested persons reasonable opportunity to submit data, views or arguments, orally at a hearing granted under subdivision (7) or in writing, and to inspect and copy the fiscal note prepared pursuant to subdivision (5); (7) grant an opportunity to present oral argument if requested by fifteen persons, by a governmental subdivision or agency or by an association having not less than fifteen members, if notice of the request is received by the agency within fourteen days after the date of publication of the notice; and (8) consider fully all written and oral submis-

mary of the Pameijer decision contained in the Garfield memo is not a regulation at all, and that reliance upon it was therefore permissible. We agree with the commission.

"The criteria that determine whether administrative action is a 'regulation' are neither linguistic nor formalistic. . . . The test is, rather, whether 'a rule has a substantial impact on the rights and obligations of parties who may appear before the agency in the future.' *Salmon Brook Convalescent Home, Inc.* [v. *Commission on Hospitals & Health Care*, 177 Conn. 356, 362, 417 A.2d 358 (1979)]." (Citations omitted.) *Maloney* v. *Pac*, 183 Conn. 313, 325–26, 439 A.2d 349 (1981). "This does not mean . . . that every administrative decision which may have precedential significance beyond the facts and party before it becomes ipso facto a regulation." *Eagle Hill Corp.* v. *Commission on Hospitals & Health Care*, 2 Conn. App. 68, 76, 477 A.2d 660 (1984). Instead, "administrative agencies must necessarily interpret statutes which are made for their guidance," and they may do so without reference to regulations. *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson*, 173 Conn. 352, 356, 377 A.2d 1099 (1977). "To rule otherwise would be to ignore the subtle and intricate interaction of law and fact. It is inherent in our judicial system of dispute resolution that the interpretation of statutes, like the development of the common law, grows out of the filtering of a set of facts through the law, as seen by the administrator or judge. The result of this application is a hybrid, composed in part of fact, in part of law, which by its existence contributes to the interpretation of a statute." Id., 356–57.

sions respecting the proposed regulation and revise the fiscal note in accordance with the provisions of subdivision (5) to indicate any changes made in the proposed regulation. No regulation shall be found invalid due to the failure of an agency to give notice to each committee of cognizance pursuant to subdivision (2) of this subsection, provided one such committee has been so notified."

In the present appeal, the commission construed the plain meaning of § 9-369b in the Pameijer decision, and elected to inform the state's superintendents of this statutory construction in the Garfield memo. The Garfield memo thus did not have a "substantial impact" on parties who would appear before the commission in the future, because it did nothing more than recite the understanding of § 9-369b articulated in the Pameijer decision. The only function that the memo served was to put superintendents on notice of the commission's published interpretation of § 9-369b.

The plaintiffs argue that the commission used its statutory construction of § 9-369b as "an interpretive rule that [it] intended to apply in all cases before it . . . ." This argument is an accurate statement of the commission's proper administrative function; accordingly, it does not avail the plaintiffs. The commission would have acted improperly if it had either (1) arbitrarily declared that a particular communication violated § 9-369b, without explaining what the terms of the statute mean or (2) failed to consistently apply the same construction of the statute in all cases before it. The regime proposed by the plaintiffs would preclude administrative agencies from relying upon past precedent, unless they had somehow promulgated each and every precedent as a regulation. This regime bears no resemblance to our system of justice, wherein each issue is resolved by reference to how similar issues have been resolved in the past.[18]

---

[18] The plaintiffs claim that the commission violated § 9-7b-12 of the Regulations of Connecticut State Agencies, which provides that "[t]he definitions provided by section 4-166 and chapter 150 of the General Statutes govern the interpretation and application of these rules." Emphasizing that "advocacy" is not defined in either § 4-166 or chapter 150, the plaintiffs conclude that the commission violated the regulation by imposing penalties for advocacy. Nothing about this regulation, however, precludes the commission from construing substantive statutory terms. Moreover, if the commission could not interpret the term "advocacy," that would render § 9-369b a nullity.

As in *Eagle Hill Corp.*, the commission in the Pameijer decision "was doing its duty. It was interpreting [a] statute, which was enacted for its guidance and which it was charged with administering . . . ." (Internal quotation marks omitted.) *Eagle Hill Corp.* v. *Commission on Hospitals & Health Care*, supra, 2 Conn. App. 77. In the present appeal, the commission relied upon this statutory construction; the commission did not promulgate a regulation.

## III

## SECTION 9-369b IS CONSTITUTIONAL

The plaintiffs argue that § 9-369b is unconstitutionally vague, both on its face and as applied.[19] We are not persuaded by either argument. In our view, the instruction contained in the statutory mandate—do not use public funds to "advocate either the approval or disapproval of [a] proposal or question"; General Statutes § 9-369b (a);—is sufficiently clear to pass constitutional muster. Even if an individual of ordinary intelligence were unable to comprehend the meaning of this language, the executive director of the commission has "urg[ed]" people to call his office "if [they] have any questions as to the enforcement of [the] law." Moreover,

---

[19] While the plaintiffs cite to the due process clause of article first, § 8, of our state constitution, they have failed to provide an independent analysis of the state constitutional issues. See *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992) (setting forth appropriate factors to be addressed when raising state constitutional claim). "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the [party] has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the [party's] claim . . . . *State* v. *Robinson*, 227 Conn. 711, 721–22, 631 A.2d 288 (1993); see also *State* v. *Williams*, 231 Conn. 235, 245 n.13, 645 A.2d 999 (1994); *State* v. *Joyner*, 225 Conn. 450, 458 n.4, 625 A.2d 791 (1993); *State* v. *Rosado*, 218 Conn. 239, 251 n.12, 588 A.2d 1066 (1991)." (Internal quotation marks omitted.) *State* v. *Ellis*, 232 Conn. 691, 692 n.1, 657 A.2d 1099 (1995). Accordingly, we limit our discussion to the due process clause contained in the fourteenth amendment to the United States constitution.

one could always seek the approving opinion of counsel before distributing materials that a court might interpret as "advocacy." Accordingly, there is little reason to fear that anyone might violate § 9-369b unwittingly. In the interest of setting forth a scrupulous account of our reasoning, we address each of the plaintiffs' vagueness arguments at greater length below.

A

Section 9-369b Is Not Vague on Its Face

It is well settled that, "[i]n the absence of weighty countervailing circumstances, it is improvident for the court to invalidate a statute on its face. *Sassone* v. *Lepore*, 226 Conn. 773, 778, 629 A.2d 357 (1993); *Lehrer* v. *Davis*, 214 Conn. 232, 235, 571 A.2d 691 (1990); *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, 203 Conn. 63, 75, 523 A.2d 485 (1987). . . . A judicial holding that a legislative Act is unconstitutional is one of very grave concern. We ought not, and will not, declare a statute to be unconstitutional unless our judgment is formed in the light of this rule of our law: It is our duty to approach the question with caution, examine it with infinite care, make every presumption and intendment in its favor, and sustain the Act unless its invalidity is, in our judgment, beyond a reasonable doubt. . . . *State* v. *Zach*, [198 Conn. 168, 177–78, 502 A.2d 896 (1985)]; see also *State* v. *Madera*, [198 Conn. 92, 105, 503 A.2d 136 (1985)]." (Citations omitted; internal quotation marks omitted.) *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 306–307, 695 A.2d 1051 (1997).

When a litigant claims that a law is vague on its face, this court will "examine the challenged statute to see if it is impermissibly vague in all of its applications. A statute that is impermissibly vague in all its applications is vague, 'not in the sense that it requires a person to

conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. . . . Such a provision simply has *no* core.' . . . *Smith* v. *Goguen*, 415 U.S. 566, 578, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974); see also *Parker* v. *Levy*, 417 U.S. 733, 94 S. Ct. 2547, 41 L. Ed. 2d 439 (1974); *State* v. *Ball*, 226 Conn. 265, 271, 627 A.2d 892 (1993); *State* v. *Pickering*, 180 Conn. 54, 65, 428 A.2d 322 (1980)." (Emphasis in original.) *State* v. *Indrisano*, 228 Conn. 795, 804, 640 A.2d 986 (1994). "Put another way, a determination that the statute is not vague with respect to at least one application will defeat [the plaintiffs'] facial challenge. This burden is augmented by our strong presumption, noted above, in favor of the statute's constitutionality. Id., 805; *State* v. *Floyd*, 217 Conn. 73, 79, 584 A.2d 1157 (1991); *State* v. *Breton*, 212 Conn. 258, 269, 562 A.2d 1060 (1989)." *Benjamin* v. *Bailey*, 234 Conn. 455, 484, 662 A.2d 1226 (1995).

Section 9-369b has an unmistakable core meaning: no one may use public funds to influence any person to vote either for or against a local proposal or question. Significantly, the plaintiffs themselves have supplied an application with respect to which the statute is not vague; they concede that the commission may punish "express advocacy" without running afoul of the constitution. Under *Benjamin*, this concession is fatal to the plaintiffs' facial claim.

B

Section 9-369b Is Not Vague as Applied

Having determined that § 9-369b sets forth a "comprehensible normative standard," we turn to the more nuanced question of whether that standard is fatally vague as the commission applied it to the plaintiffs. We answer this latter question in the negative.

As a threshold matter, it is necessary to discuss the applicable standard of review. "A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity." (Internal quotation marks omitted.) *State Management Assn. of Connecticut, Inc.* v. *O'Neill*, 204 Conn. 746, 758, 529 A.2d 1276 (1987). To demonstrate that § 9-369b is unconstitutionally vague as applied to them, the plaintiffs therefore "must . . . demonstrate beyond a reasonable doubt that [they] had inadequate notice of what was prohibited or that [they were] the victim[s] of arbitrary and discriminatory enforcement." *Connecticut Building Wrecking Co.* v. *Carothers*, 218 Conn. 580, 591, 590 A.2d 447 (1991); accord *State Management Assn. of Connecticut, Inc.* v. *O'Neill*, supra, 758; *State* v. *Hernandez*, 204 Conn. 377, 385, 528 A.2d 794 (1987); *State* v. *Wright*, 198 Conn. 273, 282, 502 A.2d 911 (1986); *McKinney* v. *Coventry*, 176 Conn. 613, 621, 410 A.2d 453 (1979).

"Because perfect precision is neither possible nor required . . . the [vagueness] doctrine does not mandate the invalidation of all imprecisely drafted statutes. *Rose* v. *Locke*, 423 U.S. 48, 49, 96 S. Ct. 243, 46 L. Ed. 2d 185 (1975); *Grayned* v. *Rockford*, 408 U.S. 104, 110, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) ('condemned to the use of words, we can never expect mathematical certainty from our language'); see also *State* v. *Eason*, 192 Conn. 37, 47, 470 A.2d 688 (1984), overruled in part on other grounds, *Paulsen* v. *Manson*, 203 Conn. 484, 525 A.2d 1315 (1987). 'While some ambiguous statutes are the result of poor draftsmanship, it is apparent that in many instances the uncertainty is merely attributable to a desire not to nullify the purpose of the legislation by the use of specific terms which would afford loopholes through which many could escape.' W. LaFave & A. Scott, Criminal Law (1972) § 11, pp. 84–85." *State* v. *Wilchinski*, 242 Conn. 211, 220, 700 A.2d 1 (1997).

Mindful of the inherent indeterminacy of statutory language, the United States Supreme Court has explained that "[t]he degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment. . . . [P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982).[20]

The United States Supreme Court has also expressed "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Id., 498–99; accord *State Management Assn. of Connecticut, Inc.* v. *O'Neill*, supra, 204 Conn. 757 ("[c]ivil statutes . . . may survive a vagueness challenge by a lesser degree of specificity than in criminal statutes" [internal quotation marks omitted]); *Seals* v. *Hickey*, 186 Conn. 337, 343, 441 A.2d 604 (1982); *State* v. *Anonymous*, 179 Conn. 155, 163, 425 A.2d 939 (1979); *McKinney* v. *Coventry*, supra, 176 Conn. 619. In the present appeal, the relevant statute expressly provides that the commission "may impose *a civil penalty* on any person" who exploits public funds to influence a local election.[21] (Emphasis added.) General Statutes § 9-369b (b).

---

[20] Notwithstanding the plaintiffs' arguments to the contrary, the present appeal bears little resemblance to *Buckley* v. *Valeo*, 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1975). Whereas *Buckley* involved an individual's right to contribute his or her own personal funds to support political candidates, the present appeal involves a group of public officials who sought to expend taxpayers' money to support the budget that they had proposed.

[21] The plaintiffs' claim that § 9-369b is "quasi-criminal" is unavailing. The plain language of § 9-369b makes it clear that the statute neither prohibits criminal conduct nor imposes a criminal sanction. We are similarly unpersuaded by the plaintiffs' claim that § 9-369b "warrants a relatively strict test for vagueness as applied" because it "has a tendency to stigmatize." (Internal quotation marks omitted.) There is stigma attached to every civil penalty; this is not sufficient to support the invocation of strict scrutiny. For purposes of vagueness analysis, the relevant inquiry is whether stigma attaches *to*

Because § 9-369b is a civil statute that does not impli-
cate any constitutional rights, we must accord substan-
tial deference to the legislature, indulging every
presumption in favor of upholding the statute. When
viewed through the lens of this standard of review, it
is apparent that the application of § 9-369b to the plain-
tiffs did not violate due process.

As we have stated, the plaintiffs bear the heavy bur-
den of "demonstrat[ing] beyond a reasonable doubt that
[they] had inadequate notice of what was prohibited or
that [they were] the victim[s] of arbitrary and discrimi-
natory enforcement." *Connecticut Building Wrecking
Co.* v. *Carothers*, supra, 218 Conn. 591. The plaintiffs can
make neither of the requisite showings. With respect to
the notice prong of this test, the plain language of § 9-
369b clearly informed the plaintiffs of what was prohib-
ited.[22] There is nothing novel or arcane about the con-
cept that no one may use public funds to (1) "advocate
either the approval or disapproval" of a referendum
or (2) "influence any person to vote for approval or
disapproval" of a referendum. We do not hold the draft-
ers of our statutes to the unattainable standard of
"mathematical" perfection. *Grayned* v. *Rockford*, supra,
408 U.S. 110. It is sufficient that the language contained
in § 9-369b "afford[s] a person of ordinary intelligence

---

*the underlying offense.* See, e.g., *Hoffman Estates* v. *Flipside, Hoffman
Estates, Inc.*, supra, 455 U.S. 499 (referring to stigma associated with drug
trafficking). In our view, the underlying conduct in the present case was
not sufficiently stigmatizing to justify a strict test for vagueness.

Finally, although the plaintiffs are correct that "[a] requirement of scienter
will often save *an otherwise vague statute*," the absence of a scienter
requirement does not compel the conclusion that a statute is unconstitution-
ally vague. (Emphasis added; internal quotation marks omitted.)

[22] As discussed previously, Sweetman was subject to two prior orders
issued by the commission. See footnote 5 of this opinion. In each instance,
the commission found that Sweetman—both personally and in his capacity
as superintendent of the district—had violated § 9-369b. Accordingly, the
plaintiffs had both actual and constructive notice of the proscription con-
tained in § 9-369b.

a reasonable opportunity" to know what conduct is prohibited. *Bishop* v. *Kelly*, 206 Conn. 608, 614, 539 A.2d 108 (1988). A reasonable person reading the text of § 9-369b would expect the commission to consider the wording of the entire communication in context, from the perspective of an ordinary reader.[23] See, e.g., *State* v. *Linares*, 232 Conn. 345, 356, 655 A.2d 737 (1995) ("the term 'unreasonable' denotes objectivity based on the circumstances"). This is precisely the standard that the commission has consistently applied.

Turning to the second prong of the *Connecticut Building Wrecking Co.* test, the plaintiffs were not the "victim[s] of arbitrary and discriminatory enforcement." *Connecticut Building Wrecking Co.* v. *Carothers*, supra, 218 Conn. 591. While it is true that the application of the statute to any particular case is irreducibly fact-specific, the same can be said of every statute, and does not suggest a constitutional infirmity. The commission has consistently applied the following standard: "communications which urge a particular result, either by express wording of advocacy or when considered as a whole, [and which] would make the *ordinary reasonable person* believe that a particular result is urged . . . constitute advocacy. . . . In determining whether a communication constitutes advocacy, the Commission reviews the entire communication and considers its style, tenor and timing." (Emphasis added.) Although the plaintiffs claim that this construction of § 9-369b is hopelessly arbitrary, in fact it contains classic objective language: officials may not use public funds to distribute communications that

[23] The language of § 9-369b is no less precise than terms that we have in the past upheld against vagueness challenges. See, e.g., *State* v. *Linares*, 232 Conn. 345, 356, 655 A.2d 737 (1995) (upholding criterion of "unreasonable noise" in criminal statute); *Bishop* v. *Kelly*, supra, 206 Conn. 614–15 (upholding statutory discretion to award multiple damages when "just").

an "ordinary reasonable person" would construe as urging a particular result.[24] Moreover, the plaintiffs have supplied no reason to believe that the commission discriminated against them, and our independent review of the record has not disclosed any basis for such a belief.

For these reasons, we conclude that the plaintiffs reasonably should have understood that their conduct was prohibited by § 9-369b. Accordingly, the statute is not unconstitutionally vague as it was applied to the plaintiffs.

## IV

### THE PAMPHLET CONTAINS ADVOCACY

The plaintiffs' next claim is that the pamphlet "did not advocate approval or disapproval" of the referendum. The commission concluded that "the material in the [pamphlet], taken as a whole, advocates an affirmative referendum vote. . . . [T]aken as a whole, [it had] the effect of influencing a person to vote in favor of the referendum." We agree with the commission.

The cover page of the pamphlet is divided into two halves, each of which is slightly larger than a sheet of typing paper. The top half proclaims in large, block capital letters that the pamphlet represents "AN EDUCATION BUDGET OF SIGNIFICANCE: **'MAKING A DIFFERENCE FOR OUR CHILDREN.'** " (Emphasis

---

[24] We decline to adopt the plaintiffs' focus on the "style, tenor and timing" language. If the commission had relied upon nothing but this language, the plaintiffs conceivably might be correct that it would have "open[ed] the door to subjective interpretation of a communication." Considered in context, however, it is apparent that the commission would have acted irresponsibly if it had *refrained* from considering the "style, tenor and timing" of a communication before determining that it "would make the ordinary reasonable person believe that a particular result is urged . . . ." The plaintiffs fail to consider this objective language.

in original.) Below this is the following logo, which appears to feature two stick figures walking toward a field in which hot air balloons sail through the sky.

The following slogan appears directly beneath this logo, in large bold print: " **'Oh, the places they'll go and the tools they'll need!'** " (Emphasis in original.)

The lower half of the front page contains an introductory message from Lentz, the budget chairman (introductory message). This message provides in pertinent part as follows: "[T]he Budget Committee has worked for many hours developing this proposal. . . . The Committee listened carefully to the advice and views expressed at the various meetings, and considered them seriously in its final deliberations.

"[Sweetman] pared . . . down [the requests made by the district school principals] and shaped them to incorporate his views of educational priorities and plans for the coming years. . . .

"The Budget Committee examined [Sweetman's] proposal, keeping in mind that 'education is our business, and our products are the future generations of citizenry.' Mindful of this mission . . . we scrutinized the

sums and items, and recommended . . . an adjusted budget . . . .

"This Board understands the need to control spending. We understand the different concerns of the different constituencies of each town. We understand the repeatedly expressed concerns for accountability and we are taking steps to demonstrate our accountability . . . . But we also understand that we must provide a solid educational program and safe environment. . . .

"In recommending this budget, the [board] is attempting to strengthen the District's present level of education . . . . We need to set aside monies . . . . It is imperative to maintain our facilities. Few people question the need for solid education of our youth. Many will agree that learning takes place best in the proper environment.

"Please think for a minute of your own budget over the last few years. Have you or your friends had an increase in income to keep pace with the rate of inflation? If not, how did you or they cope? What did you cut or adjust? Perhaps this is not an apt comparison, but we on the Board were and are faced with the same realities. At the same time, we believe that all children have the right to reach their full potential, and that it is our obligation, to the best of our ability to provide them with the means to a solid education. . . . If we eliminate what some consider frills in our schools, we no longer provide the varieties of education and discipline the District's community has come to expect for its children.

"An 8.19% [increase over the current budget] may seem steep, but let us remember what it represents: 2.9% is locked into contractual agreements; 2.7–4% reflects inflation over the last few years. Thus, only about 1.3–2.5% represents an actual increase, which is to finance our improved educational program, our maintenance

and repair plan, and some sums for future capital expenses. . . .

"We look forward to a high turnout at the polls. We need voter participation to validate our educational priorities and directions.

*"The mission of [the district] is to equip all students with knowledge, competencies, and orientations needed for future success and to empower all students to become confident lifelong learners, creative problem solvers, and caring citizens who can meet the challenges and responsibilities of a changing global community."* (Emphasis in original.)

Stripping aside the flesh of diction, the skeletal structure of this introductory message is as follows: the budget is the result of a great deal of work; the budget reflects what the community wants; the board made every effort to limit spending; the proposed expenditures are necessary; and an affirmative vote is necessary to enable students to succeed in school and in life. The board thus informed voters that they should vote for the budget, and attempted to persuade them to do so. It is apparent that the rhetoric employed by the board— " 'our products are the future generations of citizenry' "; "we must provide a solid educational program and safe environment"; "learning takes place best in the proper environment"; "all children have the right to reach their full potential"; "it is our obligation . . . to provide [children] with the means to a solid education"; "[w]e need voter participation to validate our educational priorities and directions"; "[our] mission . . . is to . . . empower all students to . . . meet the challenges and responsibilities of a changing global community"—was calibrated to convince parents and members of the community of the negative consequences that would follow if the budget were voted down.

The remainder of the pamphlet sounds the same note as the introductory message. The first page lists the members of the board and, underneath their names, contains the following pledge, in large, block capital letters: *"DEDICATED TO QUALITY EDUCATION IN HADDAM AND KILLINGWORTH."* (Emphasis in original.) The remainder of the pamphlet is divided into a number of discrete subsections. In a section entitled "What are we doing for our students?," the board explains that the budget will enable the district to "[maintain] educationally sound class sizes and our strong academic programs" and "enhanc[e] our successful extracurricular activities . . . ." Elsewhere, the board states that the district "is the biggest business in Haddam or Killingworth except for Connecticut Yankee." In our view, this text—like the text of the introductory message—contains advocacy.

As we have demonstrated, both the structure and the rhetoric of the pamphlet conveyed the message that— to borrow the words used by the board—the budget is necessary to " 'mak[e] a difference for our children,' " considering " 'the places they'll go and the tools they'll need.' " At oral argument, the plaintiffs conceded that the pamphlet expresses the following sentiment: "We've worked hard on [this budget], we've been working at it for several months. Here it is, we hope it'll get your support." We agree with the commission that this sentiment "would make the ordinary reasonable person believe that a particular result is urged . . . ." For these reasons, we conclude that the pamphlet contains advocacy in violation of § 9-369b.[25]

---

[25] The plaintiffs have attempted to justify the contents of the pamphlet by characterizing several of the passages that we have quoted as nothing more than either "data and information" or a mere "recitation of facts." Having conducted a thorough and independent review of the pamphlet, we disagree. It would serve no useful purpose to go over this ground again.

V

## SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S FACTUAL FINDINGS

The plaintiffs' remaining claims attack certain facts found by the commission. Our standard of review is well settled. We shall delineate it here, and invoke it as necessary throughout the remainder of this opinion.

"Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. *Connecticut Light & Power Co.* v. *Department of Public Utility Control*, 216 Conn. 627, 639, 583 A.2d 906 (1990); *Board of Education* v. *Commission on Human Rights & Opportunities*, 176 Conn. 533, 538, 409 A.2d 1013 (1979). *Adriani* v. *Commission on Human Rights & Opportunities*, 220 Conn. 307, 314–15, 596 A.2d 426 (1991) . . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an *important limitation* on the power of the courts to overturn a decision of an administrative agency . . . and [provides] a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and [that] the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by

substantial evidence. . . . *Newtown* v. *Keeney*, 234 Conn. 312, 319–20, 661 A.2d 589 (1995); *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 588, 628 A.2d 1286 (1993)." (Emphasis added; internal quotation marks omitted.) *Dufraine* v. *Commission on Human Rights & Opportunities*, 236 Conn. 250, 259–60, 673 A.2d 101 (1996); accord *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 541, 525 A.2d 940 (1987); *Persico* v. *Maher*, 191 Conn. 384, 409, 465 A.2d 308 (1983); *Lawrence* v. *Kozlowski*, 171 Conn. 705, 713–14, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977).

"[T]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. *Lawrence* v. *Kozlowski*, [supra, 171 Conn. 708]; *O'Donnell* v. *Police Commission*, 174 Conn. 422, 426, 389 A.2d 739 (1978); *Norwich* v. *Norwich Fire Fighters*, 173 Conn. 210, 214, 377 A.2d 290 (1977); *Balch Pontiac-Buick, Inc.* v. *Commissioner of Motor Vehicles*, 165 Conn. 559, 563, 345 A.2d 520 (1973); *Hotchkiss Grove Assn., Inc.* v. *Water Resources Commission*, 161 Conn. 50, 56, 282 A.2d 890 (1971)." (Internal quotation marks omitted.) *Feinson* v. *Conservation Commission*, 180 Conn. 421, 425–26, 429 A.2d 910 (1980); see *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 542 ("administrative agency is not required to believe any witness").

In short, we may not substitute our own conclusions for those of the commission. Rather, we are limited to determining whether the commission's conclusions of fact were "unreasonable, arbitrary, illegal or an abuse of discretion." (Internal quotation marks omitted.) *Mattatuck Museum-Mattatuck Historical Society* v. *Administrator, Unemployment Compensation Act*, 238 Conn. 273, 276, 679 A.2d 347 (1996).

A

## Sweetman Authorized the Pamphlet

The commission found as a matter of fact that Sweetman violated § 9-369b "by authorizing the expenditure of municipal funds to prepare, reproduce and distribute the [pamphlet]."[26] In his testimony before the commission, Sweetman denied responsibility for the pamphlet.[27] The commission, however, was "not

[26] In light of the commission's express finding that Sweetman "authoriz[ed] the expenditure of municipal funds," we are unable to understand Sweetman's claim that "the commission never found that [he] authorized an expenditure of funds."

[27] In the appendix to the brief that he submitted to this court, Sweetman included the following excerpts from his testimony before the commission. In the following exchange, the questions were asked by Jeffrey B. Garfield, the executive director of the commission.

"[Q.] Mr. Sweetman, you had testified that you had no control over this [pamphlet], that this was effectively a decision that was made by the budget committee of the [board].

"[A.] Mm hm.

"[Q.] If you had [had] control, would you have allowed this [pamphlet] to go out in the form that it did?

"[A.] Knowing what I knew then? What people are thinking now? It wasn't something that I was responsible or involved with. . . . I had no say . . . . We were going to do [the pamphlet], it was a good public relations thing, information that people wanted. So I am clearly . . . out of the loop. I guess maybe to answer your question, when I was subpoenaed to bring information here of any memos that I sent, any directives that I sent to people about any of this, any orders, there were none, none, none, none. My only order in this whole case was to tell [the board's director of finance operations] not to mail [the pamphlet] until we had heard contrary one way or another from the board chair. I feel that I've not been in that part of it, was not in control of that part of it. . . . I'm . . . used as an advisor for information. So I [do not] feel that I had any control one way or another."

In the following exchange, the questions are asked by Sweetman's attorney on direct examination of his client.

"Q. Did you play any role in the preparation of the budget data in the [pamphlet]?

"A. None whatsoever.

"Q. The preparation of the drafts?

"A. None.

"Q. The questions in the [pamphlet]?

"A. None.

required to believe any witness," and it expressly declined to credit Sweetman's account of the role that he played.[28] *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 542. Credibility determinations such as this are within the province of the commission, which had the unique opportunity to observe Sweetman in person, as he testified. See *Feinson* v. *Conservation Commission*, supra, 180 Conn. 425; *O'Donnell* v. *Police Commission*, supra, 174 Conn. 426; *Norwich* v. *Norwich Fire Fighters*, supra, 173 Conn. 214; *Lawrence* v. *Kozlowski*, supra, 171 Conn. 708; *Balch Pontiac-Buick, Inc.* v. *Commissioner of Motor Vehicles*, supra, 165 Conn. 563; *Hotchkiss Grove Assn., Inc.* v. *Water Resources Commission*, supra, 161 Conn. 56. Because we have nothing before us but a cold record, credibility determinations are not within our bailiwick. Sweetman nevertheless contends that the commission's determination that he authorized the pamphlet does not find substantial support in the record, and that the commission therefore abused its broad discretion. We disagree.

Sweetman is the chief executive officer of the board. In this capacity, he possesses "executive authority over the school system and the responsibility for its supervision." General Statutes § 10-157 (a). He attended two of the three meetings of the budget subcommittee at which the pamphlet was discussed, including the meeting at which it was finalized and approved. The pam-

---

"Q. The answers in the [pamphlet]?

"A. None.

"Q. Or any other aspect of the [pamphlet]?

"A. None. Excuse me, I want to be clear when I say 'none' to that last question. I told [the board's director of finance operations] not to send it out until he had heard that the time line had gone by in which, if it was going to be stopped, it would [have been] stopped by the chair."

[28] More specifically, the commission found that Sweetman was "administratively and professionally responsible for sending the [pamphlet] to households within the district."

phlet's return address indicates that Sweetman's office distributed the pamphlet. Moreover, Sweetman's name is prominently listed on the very first page of the pamphlet, set apart from the names of the other members of the board.

Significantly, Sweetman was bound by the previous consent order with the commission to ensure the district's compliance with § 9-369b.[29] As discussed previously, this consent order was executed to resolve disputes surrounding a referendum conducted less than one year before the referendum on the budget involved in the present appeal, and required the board to "[obtain] the approving opinion of counsel" before "distribut[ing] any information concerning a referendum vote." The plaintiffs do not dispute that Sweetman failed to obtain the requisite opinion of counsel before sending the pamphlet into the homes of voters.

This was not the only extant order governing Sweetman's conduct. Several years before the referendum in the present appeal, the commission issued the following order: "[Sweetman] shall henceforth ensure that equipment or supplies of the school district not be used to prepare or reproduce any printed communication which advocates a position on a referendum, except as specifically authorized by [§ 9-369b]." The plaintiffs do not dispute that the pamphlet was prepared and reproduced using the district's equipment and supplies.

Perhaps most importantly, Sweetman testified before the commission that he would not have "allowed what I would have considered [to be] advocacy to have been in [the pamphlet]."[30] In his own words, Sweetman thus

---

[29] See footnote 5 of this opinion.

[30] More fully, Sweetman testified that, "in an effort to avoid any difficulties . . . we would want to make sure that [the content of the pamphlet] was not viewed as advocacy. And Mr. Lentz had sent [me] . . . his first draft [of the introductory message]. I would not have allowed that to go out. . . .

conceded that he exercised authority over the pamphlet. This concession comports with the commission's statement that Sweetman had in the past "taken decisive action to stop the board from committing what he felt would be a violation of the General Statutes . . . by locking them out of a designated meeting place."[31] On the basis of all of this evidence, we agree with the trial court that the commission did not abuse its broad discretion by finding that Sweetman "authoriz[ed] the expenditure of municipal funds to prepare, reproduce and distribute the [pamphlet]."

## B

### The Plaintiffs Did Not Demonstrate Good Faith

The plaintiffs' final claim is that the commission abused its broad discretion by finding that the plaintiffs did not demonstrate a good faith effort to comply with § 9-369b. We are not persuaded.

In reaching the relevant finding, the commission relied heavily upon the consent order that Sweetman executed the year before the board sent the pamphlet

---

I would not have allowed what I would have considered [to be] advocacy to have been in there." This testimony is conspicuously absent from the excerpts of the proceedings before the commission that Sweetman elected to include in the appendix to the brief that he submitted to this court.

[31] In a letter written to the chair of the budget committee, Sweetman purported to "[go] on record to indicate . . . that I take no responsibility for the published [pamphlet] approved by you and the Budget Committee. This [pamphlet] is developed by the board and the Budget Committee and is approved and directed for printing and distribution by you as the Board of Education Chair." In the very next sentence, however, Sweetman expressly stated that he would "tak[e] it as a directive from you as the Chair of the Board that unless I hear differently, *I should have [the pamphlet] printed.*" (Emphasis added.) In light of the substantial evidence that we have discussed, the commission reasonably could have declined to credit Sweetman's self-serving statement that he was not responsible for the pamphlet.

into the homes of voters.[32] More specifically, the commission explained that the plaintiffs "were board members at the time the Commission approved the consent agreement and order with . . . Sweetman . . . . [More than one year before they prepared and distributed the pamphlet, the plaintiffs] were informed of the consent agreement . . . by the then chairman in a board meeting, and by press release distributed to board members. A copy of the consent agreement and order itself was distributed to the four board officers, which at the time included [two of the plaintiffs]. . . . [The plaintiffs'] testimony to the contrary that they were unaware of the [consent order] is improbable, at best." Based upon these findings of fact, the commission determined that the plaintiffs "have not demonstrated good faith" and ordered them to reimburse the district for the cost of the pamphlet.

By its terms, the consent order requires the board to obtain "the approving opinion of counsel" before "distribut[ing] any information concerning a referendum vote . . . ." Before the commission, the plaintiffs claimed that they were not aware of this order. The commission expressly rejected this factual claim, characterizing it as "improbable, at best." We reiterate that credibility determinations such as this are within the province of the commission, which had the unique opportunity to observe the plaintiffs in person, as they testified. See *Feinson* v. *Conservation Commission*, supra, 180 Conn. 425; *O'Donnell* v. *Police Commission*, supra, 174 Conn. 426; *Norwich* v. *Norwich Fire Fighters*, supra, 173 Conn. 214; *Lawrence* v. *Kozlowski*,

---

[32] To reiterate, the consent order required the board to obtain the approving opinion of counsel before "distribut[ing] any information concerning a referendum vote . . . ." The consent order also recited the terms of the commission's prior order against Sweetman, which required him to ensure compliance with § 9-369b. See footnote 5 of this opinion for the pertinent portions of these orders.

supra, 171 Conn. 708; *Balch Pontiac-Buick, Inc.* v. *Commissioner of Motor Vehicles*, supra, 165 Conn. 563; *Hotchkiss Grove Assn., Inc.* v. *Water Resources Commission*, supra, 161 Conn. 56.

The plaintiffs cannot carry the heavy burden of demonstrating that the commission abused its broad discretion. The commission explained that all of the plaintiffs were members of the budget subcommittee, and that all of them were members of the board at the time that Sweetman entered into the consent agreement. Moreover, the commission expressly found that the chairman of the board informed the plaintiffs of the consent order. This evidence affords an ample basis from which the commission reasonably could have determined that the plaintiffs were aware of the consent order.[33]

The commission thus reasonably concluded that the plaintiffs knew that, pursuant to the consent order, they were not permitted to "distribute *any information* concerning a referendum vote without the approving opinion of counsel that such distribution is not in violation of [§ 9-369b]." (Emphasis added.) The plaintiffs do not dispute that the pamphlet contains information concerning a referendum vote.[34] Nor do the plaintiffs dispute that they failed to obtain the requisite opinion

---

[33] The board claims that Wolak, in particular, "did not participate in the board's decision to distribute the [pamphlet]." The board does not, however, dispute the following facts: (1) Wolak was a member of the board at the time that Sweetman executed the consent agreement; (2) Wolak was a member of the budget subcommittee; (3) the chairman of the board informed Wolak of the consent order; and (4) Wolak participated in the meeting at which the pamphlet was first discussed. In light of this evidence, we are not willing to say that the commission abused its discretion by ordering Wolak to bear her fair share of reimbursing the district for the funds that the board expended on preparing and distributing the pamphlet.

[34] The plaintiffs point out that the consent order involved a flyer sent home from school with children, whereas the pamphlet was mailed directly to the homes of voters. As the plain language of the consent order indicates, however, this is a distinction without a difference.

of counsel. It follows a fortiori that the commission reasonably could have determined that the plaintiffs "have not demonstrated good faith in attempting to comply with the provisions of [§ 9-369b]." Accordingly, we are unwilling to disturb the judgment of the trial court dismissing the plaintiffs' appeals.

The judgment is affirmed.[35]

In this opinion the other justices concurred.

---

[35] See footnote 7 of this opinion.