[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I.
The plaintiffs, the Hayes Family Limited Partnership and the Conyers Family Limited Partnership (collectively, the applicants), appeal pursuant to General Statutes § 22a-43
from the decision of the defendant, the town of Vernon Inland Wetlands Commission.[1] The defendant acted pursuant to its authority under the Inland Wetlands and Watercourses Act, Chapter 440 of the Connecticut General Statutes, and denied the plaintiffs' application for a construction permit for a travel station on an undeveloped property owned by the plaintiff.
This appeal, dated June 12, 1998, concerns a parcel of property located in Vernon, Connecticut known as Vernon Assessor's Map 46, Block 71, Parcel 19. The applicants sought permission to construct a travel plaza on a portion of their property. CT Page 13706
Public hearings commenced on March 24, 1998, and continued, and concluded, on April 28, 1998. (Return of Record [ROR]: Public Hearing Transcript from 3/24/98; Town of Vernon Inland Wetlands Commission Minutes from 3/24/98; Public Hearing Transcript from 4/28/98; Town of Vernon Inland Wetlands Commission Minutes from 4/28/98). At its May 26, 1998 meeting, the commission voted to deny the application on the basis that it failed to meet the tests of Section 4.5.4.4. of Vernon's inland wetlands regulations. (ROR: 5/27/98 letter from commission chairman William Campbell to applicants' attorney Leonard Jacobs). The applicants now appeal from the decision of the commission to the superior court.
 II.
"[A]ppellate jurisdiction in administrative appeals is created only by statute and can be acquired and exercised only in the manner prescribed by statute." Munhall v. Inland WetlandsCommission, 221 Conn. 46, 50, 602 A.2d 566 (1992).
"[I]n order to have standing to bring an administrative appeal, a person or entity must be aggrieved. . . ." WaterPollution Control Authority v. Keeney, 234 Conn. 488, 493,662 A.2d 124 (1995). General Statutes § 22a-43 (a) provides, in part, "any person aggrieved by any . . . decision made pursuant to sections 22a-35 to 22a-45, inclusive, by the commissioner . . . may . . . appeal to the superior court for the judicial district where the land affected is located. . . ." "Aggrievement is a question of fact for the trial court and the plaintiff has the burden of proving that fact. . . . Pleading and proof of facts that constitute aggrievement are essential prerequisites to the trial court's subject matter jurisdiction over an administrative appeal. . . ." (Citations omitted; internal quotation marks omitted.) Water Pollution Control Authority v. Keeney, supra, 493.
"The fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision. . . ." (Citations omitted; CT Page 13707 internal quotation marks omitted.) Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525, 530, 525 A.2d 940 (1987). "The plaintiff[s]' status as owner[s] of the property establishes that [they] have "a specific personal and legal interest in the subject matter of the decision." Id. "The fact that the agency's decision resulted in the denial to the plaintiff[s] of the ability to use this property as proposed establishes that this specific personal and legal interest has been specially affected." (Internal quotation marks omitted.) Id.
In the present case, the plaintiffs allege in the appeal that "it was the applicant and owner of the Property, and the denial of its application will prevent it from developing the property as proposed, to its economic loss and damage." In addition, during the hearing on this appeal the plaintiffs testified as to their legal ownership of the parcel of land and the defendant conceded to the facts as presented by the plaintiffs. As such the plaintiffs have demonstrated a specific legal interest in the subject matter which has been injuriously affected by the decision by the Commission. Huck v. Inland Wetlands Watercourses Agency, supra, 203 Conn. 530.
Accordingly, aggrievement is found.
 III.
"The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial . . . the credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . ." (Citations omitted; internal quotation marks omitted.) Huck v. Inland Wetlands Watercourses Agency, supra, 203 Conn. 539-41. "This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred." (Internal quotation marks omitted.) Id., 541.
"In challenging an administrative agency action, the plaintiff has the burden of proof. . . . The plaintiff must do more than simply show that another decision maker, such as the trial court, might have reached a different conclusion. Rather CT Page 13708 than asking the reviewing court to retry the case de novo . . . the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision. . . ." (Citations omitted.) Samperi v. Inland WetlandsAgency, 226 Conn. 579, 587, 628 A.2d 1286 (1993).
 IV.
The plaintiffs appeal the decision denying their application on several grounds, including: 1) that "[t]he reason stated by the commission as the basis for the denial of the plaintiffs application is not supported by substantial evidence;" 2) that "[t]he record contains substantial evidence of the public benefits to be provided by the plaintiffs' project;" and 3) that "[s]ection 4.5.4.4 of the regulations creates a standard for evaluating applications which is not authorized by the Connecticut General Statutes."[2] Plaintiffs' Brief,
pp. 14-25.
"In granting, denying or limiting any permit for a regulated activity the inland wetlands agency, or its agent, shall consider the factors set forth in section 22a-41, and such agency, or its agent, shall state upon the record the reason for its decision."[3]
"In reviewing an inland wetlands agency decision made pursuant to the act, the reviewing court must sustain the agency's determination if `an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from CT Page 13709 the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . .'" (Citations omitted.) Samperi v.Inland Wetlands Agency, supra, 226 Conn. 588-89, quoting Huck v.Inland Wetlands Watercourses Agency, supra, 203 Conn. 540-42.
In the present case, the defendant denied the plaintiffs application on the ground that "the proposal did not meet the tests of Section 4.5.4.4 of the regulations." According to the commission, "[t]he risk to the Gages brook, Walker's reservoir and the Tankerhosen River was too great in the event of a failure of the 87,000 gallon fuel storage system and containment facilities." Also "[t]he Tankerhosen River is a prime cold water trout fishery and thus [t]he tests of 4.5.1.9, 4.5.1.10 and 4.5.2.5 were not met since the risk of "injury to" "reasonable use of" as well as the possibility of chemical thermal changes to on site and off site water courses is significant." (ROR: letter of 5/27/98 from commission chairman William Campbell to applicants' attorney Leonard Jacobs.)
A. Whether § 4.5.4.4 of the Town of Vernon Regulations Creates a Standard For Evaluating Applications Which is Not Authorized by the Connecticut General Statutes[4]
"The legislature has found that `the inland wetlands and watercourses of the state of Connecticut are an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed' and that `the preservation and protection of the wetlands and watercourses from random, unnecessary, undesirable and unregulated uses, disturbance or destruction is in the public interest and is essential to the health, welfare and safety of the citizens of the state.' General Statutes § 22a-36. The purposes of the [Inland Wetlands and Watercourses A]ct, therefore, are, inter alia, to `protect the citizens of the state by making provisions for the protection, preservation, maintenance and use of the inland wetlands and watercourses by minimizing their disturbance and pollution; maintaining and improving water quality in accordance with the highest standards set by federal, state or local authority . . . and protecting the state's potable fresh water supplies from the dangers of . . . pollution . . . by CT Page 13710 providing an orderly process to balance the need for the economic growth of the state and the use of its land with the need to protect its environment and ecology in order to forever guarantee to the people of the state, the safety of such natural resources for their benefit and enjoyment and for the benefit and enjoyment of generations yet unborn.' General Statutes § 22a-26.
"In order to carry out these objectives, the legislature has required each municipality in this state either to `establish an inland wetlands agency or authorize an existing board or commission to carry out the provisions of the IWWA [Inland Wetlands and Watercourses Act].' General Statutes § 22a-42
(c). Each municipality is expressly authorized through its designated agency to adopt regulations that `are necessary to protect the wetlands and watercourses within its territorial limits'; General Statutes § 22a-42 (c); provided that any regulations adopted are `in conformity with the regulations adopted by the commissioner pursuant to section 22a-39. . . .' General Statutes § 22a-42 (c)." Lizotte v. ConservationCommission, 216 Conn. 320, 329-30, 579 A.2d 1044 (1990). The Connecticut Supreme Court has acknowledged that "the statutory scheme of this legislation envisages its adaptation to infinitely variable conditions for the effectuation of the purposes of these statutes.'" Id., 330.
Vernon's Inland Wetlands Regulation § 4.5.4.4 states that if the commission is to grant a permit, with or without any restrictions it must find that "the public benefit of the proposed activity justifies any possible degradation of the wetlands and/or watercourses." (ROR: Town of Vernon, Connecticut Inland Wetlands and Watercourses Regulations, p. 16.). In their appeal, the plaintiffs claim that regulation § 4.5.4.4 is not in conformity with Connecticut statutory provisions and creates an unauthorized standard because it requires "a comparison between the public benefit of a project and the possibledegradation of the wetlands, whereas § 22a-36 to § 22a-45
of the Connecticut General Statutes attempts to protect the wetlands from actual degradation." (Emphasis added.) Plaintiffs'Brief p. 22. Specifically, the plaintiffs claim that because "anything is possible" any application to conduct regulated activities could be denied "because of the remote possibility of degradation of the wetlands, even though there is no substantial evidence in the record to justify a belief that degradation will occur." Id., 22-23. "The statutes," the plaintiff claims, "are concerned with preventing damage to wetlands, not a theoretical CT Page 13711 possibility based upon inadequate evidence." Id., 23.
In support of their claim that regulation § 4.5.4.4 conflicts with the IWWA, the plaintiffs rely on the "substantial evidence" standard for reviewing commission decisions. The plaintiffs argue that because Connecticut law requires a commission's decision to be supported by substantial evidence if the decision is to be upheld in superior court; Huck v. InlandWetlands Watercourses Agency, supra, 203 Conn. 525; a regulation that allows the commission to deny an application based upon the mere "possibility" that degradation will occur allows the commission to circumvent the requirement that their decision to deny the application be based upon substantial evidence. Plaintiffs' Brief, pp. 23-34.
"In Aaron [v. Conservation Commission, 183 Conn. 532,441 A.2d 30 (1981)] [the Connecticut Supreme Court] stated that an appropriate test `used to determine whether a conflict exists [between a local ordinance and a statute] is whether the ordinance permits or licenses that which the statute forbids, or prohibits that which the statute authorizes; if so, there is a conflict. If, however, both the statute and the ordinance are prohibitory and the only difference is that the ordinance goes further in its prohibition than the statute, but not counter to the prohibition in the statute, and the ordinance does not attempt to authorize that which the legislature had forbidden, or forbid that which the legislature has expressly authorized, there is no conflict.' Aaron v. Conservation Commission, supra, 544. This test is founded upon the principle that `[a] local ordinance, enacted pursuant to the police power, is not necessarily inconsistent with a state law on the same subject just because the ordinance provides higher standards than the statute.' Id., 543." Lizotte v. Conservation Commission, supra,216 Conn. 333.
The court finds that regulation § 4.5.4.4 does not create an unauthorized standard for evaluating applications to conduct regulated activities. General Statutes § 22a-42a(d) authorizes a municipal commission to deny a permit application for conducting regulated activities, so long as the provisions of § 22a-41 are complied with. Lizotte v. ConservationCommission, supra, 216 Conn. 333. General Statutes § 22a-41
(5) requires, with respect to granting or denying a permit, the consideration of "[t]he character and degree of injury to, or interference with, safety, health or the reasonable use of CT Page 13712 property which is caused or threatened by the proposed regulated activity. . . ." (Emphasis added.) Thus contrary to the plaintiffs claim, the IWWA does not only attempt "to protect the wetlands from actual degradation." Plaintiffs' Brief, p. 22. Rather, the IWWA specifically acknowledges that "the degree of injury . . . threatened by the proposed regulated activity" can be a basis for the denial of a permit. Moreover, the Connecticut Supreme Court has stated that "[e]very intendment is to be made in favor of the validity of the ordinance, and it is the duty of the lower court to sustain the ordinance unless its invalidity is established beyond a reasonable doubt." Mario v. Fairfield,217 Conn. 164, 169, 163 A.2d 548 (1991).
B. Whether the Commission's Decision Denying the Plaintiffs' Application for Failure to Meet the Requirements of Regulation 4.5.4.4 Supported by Substantial Evidence?
The plaintiffs claim that the only reason cited by the defendant in support of its denial of the plaintiffs' application was that "failure of the 87,000 gallon full [sic] storage or containment system would result in degradation to the Tankerhosen River and Walkers Reservoir, and that would outweigh any public benefit of the project." Plaintiffs' Brief, p. 16. The plaintiffs further claim that the only evidence regarding the fuel containment system was favorable, and was introduced by the applicants themselves. Id., 16. Therefore, the plaintiffs argue, there is no substantial evidence in the record to support the commission's denial of their application based upon the possible degradation of the wetlands resulting from a failure of the fuel storage containment system. Id., 18.
"Judicial review of an administrative agency decision requires the court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . In short a court may not substitute its own conclusions for those of the commission. Rather, the court is limited to determining whether the commissions conclusions of fact were `unreasonable, arbitrary, illegal or an abuse of discretion.'" Sweetman v. State ElectionsEnforcement Commission, 249 Conn. 296, 331-32 ___ A.2d ___ (1999).
It is found that the commission's denial of the plaintiffs' application was not based solely upon the basis that a "failure CT Page 13713 of the 87,000 gallon [fuel] storage containment system would result in degradation to the Tankerhosen River and Walkers Reservoir, and that would outweigh and public benefit of the project." In making this claim, the plaintiffs rely on the commission's minutes of June 23, 1998. (ROR: 6/23/98, commission minutes).[5] However, they only rely on one paragraph of those minutes and overlook two other paragraphs. One of the other two relevant paragraphs states that "Mr. Campbell [the commission's chairman] cited sections 4.5.1.9, 4.5.1.10 and the last sentence of 4.5.2.5 in support of the motion [to deny the application] and expanded upon the potential environmental damage downstream, as well as on-site damage, from a fuel spill." (ROR: 6/23/98, commission minutes). The second paragraph states that "Ms. Wiley [of the commission stated that the Tankerhosen River downstream from the project is a prime cold water trout fishery." (ROR: 6/23/98, commission minutes). These two paragraphs appear with the paragraph cited by the plaintiffs in the decision published by the commission denying the plaintiffs' application. (ROR: 5/27/98 letter from commission to plaintiffs' attorney). Moreover, the June 23, 1998, minutes contain corrections to the May 26, 1998, minutes, not substantive changes. (ROR: 5/27/98 letter from commission to plaintiffs' attorney; 6/2/98 letter from George Russel, Town Planner, to the Inland Wetlands Commission; 6/23/98 commission minutes, p. 2.). Thus, it is found that the plaintiffs' interpretation of the importance of the June 23, 1998, minutes is not complete and it is held that the record does support a finding that the commission's decision is based upon substantial evidence.
The record also reveals the following. At the hearing the following people supported the plaintiffs' application: Bob Arsenault from Design Professionals, Inc., the engineering and surveying firm that drafted the plaintiffs' plans; John Ianni, the plaintiffs' soil scientist; Michael Klein, the plaintiffs' environmentalist; Daryl Hicks, an engineer from Pilot Oil, the plaintiffs' proposed tenant; Rachel Rosen and Sherry Hardmin from Environmental Services. Bob Arsenault specifically addressed the issue of the fuel storage containment system. (ROR: 3/24/98 hearing transcript). Mr. Arsenault testified that 87,000 gallons of fuel would be stored above ground in a system employing four different levels of protection against incidental spillage as well as catastrophic spillage. (ROR: 3/24/98 hearing transcript, p. 12). The four levels of containment would include a shell surrounding the fuel tanks, a coated monorific combination curb and slab coated facility, an interseptic tank and a lined CT Page 13714 containment pond. In total, the system would provide 178% protection in containment of fuel in case of a spill, leak or rupture. According to Arsenault, "with this particular proposal, everything [would be] done that should be done for a site like this when you have wetlands in close proximity." (ROR: 3/24/98 hearing transcript, p. 13).
The plaintiffs claim that this testimony and some minimal unreported testimony by Daryl Hicks is the only evidence that was introduced relevant to the fuel containment system. Plaintiffs'Brief, pp. 3-5, 17. The plaintiffs acknowledge that opponents did speak out against their application, but they claim that because none of the criticisms had to do with the fuel containment system, the "commission should not have denied the application based upon any concern for possible degradation to wetlands resulting from a failure of the fuel storage containment system." Id., 18-19. Furthermore, the plaintiffs argue, "[c]onsidering the fact that there were substantial benefits[6] to be derived from the Plaintiffs' project, and no substantial evidence to support the reason given by the commission for its denial . . . applying the standards set forth in Section 4.5.4.4. of the Regulations, the application should have been approved by the commission." Id., 21.
In opposition to the plaintiffs' claim, the defendant argues that although the applicants presented the testimony of several experts in support of the application, "there were experts who testified and presented evidence contrary to that of the Plaintiff Applicants." Defendant Commission's Brief, p. 5. Specifically, the defendants point to the testimony of Robert Jontos, Attorney Burke and Attorney Oland. Id., 5-6. Therefore, because there was substantial evidence presented in opposition to the plaintiffs' application, the defendant claims pursuant toHuck v. Inland Wetlands Watercourses Agency, there is "a substantial basis that supports the Commission's denial of the application." Id., 6.
The court's function in reviewing the record in an administrative appeal is "to determine on the basis of the record whether substantial evidence has been presented to the board to support its finding." Jaser v. Zoning Board of Appeals,43 Conn. App. 545, 548, 684 A.2d 735 (1996), citing Westport v. Norwalk,167 Conn. 151, 161, 355 A.2d 25 (1974). The finding is not simply whether or not the application was granted or denied. If the commission, in denying or granting the application states its CT Page 13715 reasons for doing so on the record, the court is to only consider whether there is substantial evidence to support the reasons cited; not whether there is substantial evidence to support the commission's decision based upon other reasons that could potentially be gleaned from the record. Jaser v. Zoning Board ofAppeals, supra, 43 Conn. App. 548 ("Where the board states its reasons on the record we look no further."). Thus, the fact that Robert Jontos opposed the application because he had concerns surrounding the stability of the hydraulic system; (ROR: 3/24/98 hearing transcript, p. 25); does not support the commission's decision to deny the application based on the risk posed by a failure of the fuel containment system.
However, during the public hearings, there were opinions expressed concerning the fuel storage containment system. Attorney Burke, on behalf of his client, Gary Jackopsic,[7]
testified that "the important factors here are 87,000 gallons of pure oil. I don't care whether they are raised or subsurface or whatever they are. They're over an aquifer. . . . Notwithstanding all of the 187% [sic] excess capacity that the Pilot engineer talked to you about, the potential for spillage is immense. You have an environmentally sensitive parcel and there is new evidence tonight that it's a habitat for native not only trout but black-nosed dice and a certain type of minnow." (ROR: 3/24/98 hearing transcript, p. 27). Attorney Burke also pointed out that the Tolland Inland Wetlands Commission, in a letter to the Vernon Inland Wetlands Commission, described the proposal to be "environmentally unsound." (ROR: 3/24/98 hearing transcript, p. 26). The letter, which was before the commission stated in relevant part: "We recognize that there have been some additional steps taken to collect fuel spills in the vicinity of the fuel tanks and the pump islands, however, we feel that the entire parking lot is subject to innumerable small leaks of gasoline, oil, antifreeze and other automotive liquids which will be concentrated in the retention basin. The oil separator chambers will be maintained, but what will become of the parking lot wash off? There is some indication that the retention ponds are drained below surface (although this is not entirely clear), will the ponds be periodically cleaned? or will these hazardous materials be allowed to concentrate until some unfortunate, inevitable accident allows them to spill into Gages Brook? . . . Overall the Tolland Inland Wetlands Commission still finds the Conyers-Hayes proposal to be environmentally unsound for the same reasons as before: . . . 2. The approval of this proposal would allow the storage and transfer of hazardous material in and near CT Page 13716 a wetland area which will pose a very real hazard to this particular wetland and all areas down stream; and 3. This particular use, a Travel Park, is unsuitable to be located in an area of wetlands because in addition to the amount of hazardous material which is stored and transferred on the site, the use itself will tend to draw additional traffic to the site with an attendant increase in hazardous materials and the potential for accidental spills which may pollute the wetland." (ROR: 3/18/98 letter from Tolland Inland Wetlands Commission to Vernon Inland Wetlands Commission, pp. 1-2).
Chairman Campbell also expressed concern over leakage and spillage associated with the presence of the oil tanks. He stated on the record: "It is my understanding that there is a fishery in the Tancanhosett [sic] that there is a breeding or a responding area in the Tancanhosett. Why wouldn't you be concerned about runoff from the pavement of this project under the interstate through the reservoir into the Tancanhosett and potentially with oil and fuel from the parking lot alone. It seems to be that the tanks. [sic] A lot of good engineering has gone into that, but even just runoff for whatever reasons. Why wouldn't that be a problem downstream in the Tancanhosett?" (ROR: 4/28/98 hearing transcript, p. 53). Evidence was received by the commission verifying that there is a cold water fishery in Gages Brook. (ROR: Exh. 19, p. 1).
Finally, although the plaintiffs claim that all of the testimony provided by their experts supported the reliability of the fuel containment system, a comment by Daryl Hicks could have been taken by the commission as evidence of the system's fallibility. When asked about keeping the containment pond clear of sedimentation, Mr. Hicks conceded that "if in fact, sedimentation does get through into that area it would decrease the capacity of the pond." (ROR: 3/24/98 hearing transcript, pp. 34-45.) He added, however, that such an occurrence would be "highly unlikely." Id.
Based upon this evidence, the record contains substantial evidence to support the commission's decision. Though there was testimony from the plaintiffs' experts that the fuel containment system was reliable and safe, "[t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency." Sweetman v. StateElections Enforcement Commission, supra, 249 Conn. 332. "An administrative agency is not required to believe any witness, CT Page 13717 even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." Huck v. InlandWetlands Watercourses Agency, supra, 203 Conn. 539-40. In this case, the commission had before it, in addition to testimony in support of the application, strong testimony and evidence in opposition to the application because the application proposed the presence of 87,000 gallons of fuel oil. This oil was seen as a risk both in the event of a catastrophic spill and in relation to incidental spilling from the every day filling of cars and trucks. Although there was evidence before the commission that the public benefits could have been many and varied,[8] the commission also had before it evidence that in the event of contamination from the hazardous oil a cold water trout fishery among other things could be destroyed. The commission could have found that the benefits outweighed the risks or that the risks outweighed the benefits. However, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Huck v. Inland Wetland WatercoursesAgency, supra, 203 Conn. 541. In this case, the commission felt that this risk was too great. The testimony of Attorney Burke, the letter of the Tolland Inland Wetlands Commission, and the evidence of the trout fishery constitute sufficient evidence and support the commission's decision to deny the plaintiffs' application.
Accordingly, the court finds that there is substantial record evidence to support the finding of the defendant that the public benefits of the project did not justify the risk to the Gages Brook, Walkers Reservoir and the Tankerhosen River, in the event that the 87,000 gallon fuel containment system failed.
Therefore, the appeal is hereby dismissed.
Stengel, J.