[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I Statement of the Case
The plaintiff, Shawn Martinez, through his parent and next friend Donna Martinez, appeals the final decision of the defendant, the department of mental retardation (DMR), finding him ineligible for services from the DMR. The DMR acted pursuant to General Statutes § 1-1g and §17a-212-1 et seq. of the Regulations of Connecticut State Agencies. The plaintiff appeals pursuant to General Statutes § 4-183.
 II Procedural History Background Facts
CT Page 5741-dl
The record reveals the following facts. On June 9, 1997, the DMR determined that the plaintiff was not eligible for services because he did not meet the criteria established for a diagnosis of mental retardation. (Return of Record [ROR], Volume II, R-15, p. 72.) The letter from DMR denying services to the plaintiff indicated that his disability appeared to be more related to social-emotional difficulties and psychiatric disorders. (ROR, Volume II, R-15, p. 72.) The letter also indicated that, according to the examiner administering the test, the validity of the plaintiff's test scores were compromised. (ROR, Volume II, R-15, p. 72.) The DMR conducted a review of the plaintiff's eligibility for services in August 1998. (ROR, Volume II, R-14, p. 70.) The DMR stated in the letter that "Shawn would appear to be a child with extremely complex needs stemming from a significant social-emotional disorder. His compromised adaptive functioning and inconsistent performance on intelligence tests reflects his psychiatric disability. It is not indicative of mental retardation." (ROR, Volume II, R-14, p. 71.)
On June 14, 1999, Donna Martinez requested a review of her son's eligibility due to new medical information. (ROR, Volume II, R-10, p. 66.) The DMR denied services again based on the fact "that social and emotional difficulties interfere with cognitive reasoning and the validity of the scores obtained would appear compromised." (ROR, Volume II, R-6, p. 57.) A child advocate acting on behalf of Donna Martinez requested a hearing on August 12, 1999. (ROR, Volume II, R-4, Item M, p. 49.)
The hearing was held on September 16, 1999. (ROR, Volume III, R-24, p. 96.) After hearing the testimony of experts and reviewing the evidence submitted by the parties, the hearing officer provided the parties with a proposed decision. (ROR, Volume I, R-3, pp. 6-10.) The hearing officer found that the plaintiff was not eligible for services from the DMR because psychiatric, social and emotional issues and Klinefelter's syndrome appear to be significant factors related to his compromised functioning. (ROR, Volume I, R-3, p. 10.) The parties had ten days in which to respond in writing to the proposed decision. (ROR, Volume I, R-3, p. 10.) The plaintiff's representative responded to the decision claiming that the plaintiff does meet the criteria in General Statutes § 1-1g and that his cognitive functioning and test scores have continued to drop or remain in the mental retardation range. (ROR, Volume I, R-2, p. 3.)
On November 5, 1999, a final decision was issued by the commissioner of the DMR after reviewing the parties' comments, the proposed decision and CT Page 5741-dm the exhibits presented at the hearing. (ROR, Volume I, R-1, pp. 1-2.) The commissioner concurred with the hearing officer's finding that Shawn Martinez is not eligible for services of the DMR. (ROR, Volume I, R-1, p. 1.) The commissioner stated that Donna Martinez had not provided sufficient evidence that Shawn Martinez has sub-average general intellectual functioning. (ROR, Volume I, R-1, p. 1.) The commissioner also stated that the early test scores showed the plaintiff functioning in the normal to low average range of intelligence and that more recent test scores may have been affected by social and emotional difficulties and inconsistent compliance with testing. (ROR, Volume I, R-1, p. 1.) The most recent test showed a verbal score of 79 which was 7 points higher than a test administered in 1997. (ROR, Volume I, R-1, p. 2.) The commissioner also found that the full scale score of 65 on the most recent test was questionable based on a difference between verbal and performance scores of over 20 points. (ROR, Volume I, R-1, p. 2.) Additionally, the commissioner determined that the plaintiff's compromised functioning appeared to be primarily related to his psychiatric, social and emotional difficulties and his more recent diagnosis of Klinefelter's Syndrome. (ROR, Volume I, R-1, p. 2.) The plaintiff now appeals the final decision of the DMR.
 III Jurisdiction
"It is well established that the right to appeal an administrative action is created only by statute and a party must exercise that right in accordance with the statute in order for the court to have jurisdiction." (Internal quotation marks omitted.) Water Pollution Control Authority v.Keeney, 234 Conn. 488, 492 (1995). General Statutes § 4-183 governs appeals from decisions by the DMR. General Statutes § 4-183 (a) provides that "[a] person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section."
 A Aggrievement
"Aggrievement is a question of fact for the trial court and the plaintiff has the burden of proving that fact. . . . Pleading and proof of facts that constitute aggrievement are essential prerequisites to the trial court's subject matter jurisdiction over an administrative appeal." (Citations omitted; internal quotation marks omitted.) Water PollutionControl Authority v. Keeney, supra, 234 Conn. 493. "The test for determining aggrievement is a two part inquiry: [F]irst, the party CT Page 5741-dn claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision. . . ." (Citations omitted; internal quotation marks omitted.) Id., 494.
In the present case, the plaintiff has demonstrated a specific and personal legal interest in the subject matter of the decision because he is seeking services from the DMR. The second part of the test is satisfied because the DMR decided that the plaintiff is not eligible for services from the DMR. The DMR is not challenging aggrievement and the plaintiff has satisfied the two part test for aggrievement. Accordingly, the court finds that the plaintiff is aggrieved.
 B Timeliness of the Appeal and Service of Process
The appeal must be timely. General Statutes § 4-183 (c) provides that "[w]ithin forty-five days after mailing the final decision . . . a person appealing as provided in this section shall serve a copy of the appeal on the agency that rendered the final decision at its office or at the office of the Attorney General in Hartford and file the appeal with the clerk of the superior court for the judicial district of New Britain or for the judicial district wherein the person appealing resides. . . ." Service of the appeal may be made by mail or personal service. General Statutes 4-183 (c). The DMR mailed the final decision to the plaintiff on or about November 5, 1999. (ROR, Volume I, R-3, p. 1.) A certified copy of the summons and complaint was mailed to Peter O'Meara, commissioner of the DMR on December 17, 1999. (Affidavit of Sherri Martin; certified mail receipt.) The plaintiff filed the appeal with the clerk of the Superior Court in the judicial district of New Britain on December 17, 1999. The court finds that the plaintiff filed a timely appeal and served the appropriate party pursuant to General Statutes § 4-183 (c).
 IV Scope of Judicial Review
"The standard of review in appeals from the decisions of administrative agencies is clearly delineated. Judicial review of an administrative agency's action is governed by the Uniform Administrative Procedure Act (General Statutes, c. 54, §§ 4-166 through 4-189) and the scope of CT Page 5741-do that review is very restricted." (Brackets omitted; internal quotation marks omitted.) State Board of Labor Relations v. Freedom of InformationCommission, 244 Conn. 487, 493-94 (1998). General Statutes § 4-183
(j) provides that "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
"Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . ." (Citations omitted; internal quotation marks omitted.) Cadlerock Properties JointVenture, L.P. v. Commissioner of Env. Protection, 253 Conn. 661, 676
(2000), cert. denied, ___ U.S. ___ 121 S.Ct. 1089, 148 L.Ed.2d 963
(2001). "The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. . . . An administrative finding is supported by substantial evidence if the record affords a basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . ." (Citations omitted; internal quotation marks omitted.) Id. Our Supreme Court has concluded that substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . ." (Citations omitted; internal quotation marks omitted.) Id., 677.
"With regard to questions of fact, it is [not] the function of the trial court . . . to retry the case or to substitute its judgment for that of the administrative agency. . . . Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of CT Page 5741-dp its discretion. . . . Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement." (Citations omitted; internal quotation marks omitted.) State Board of Labor Relations v.Freedom of Information Commission, supra, 244 Conn. 494. "The credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency." (Citations omitted; internal quotation marks omitted.) Sweetman v. State Elections EnforcementCommission, 249 Conn. 296, 332 (1999). "The burden is on the [plaintiff] to demonstrate that the [agency's] factual conclusions were not supported by the weight of substantial evidence on the whole record." New EnglandCable Television Association, Inc. v. DPUC, 247 Conn. 95, 118 (1998).
 V Discussion
The DMR issued a final decision upholding the hearing officer's determination that Shawn Martinez is not eligible for services from the DMR. The decision was based on the DMR's findings that the plaintiff's compromised functioning is primarily related to his psychiatric, social and emotional disorders, and the more recent diagnosis of Klinefelter's Syndrome.
The plaintiff claims that the decision of the DMR is in violation of constitutional or statutory provisions, in excess of the statutory authority of the agency, and clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. (Complaint, ¶¶ 19-21.) The plaintiff also alleges violations of the rights to due process and equal protection, but does not brief these issues. "Where an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived." Bridgeport Hospital v.Commission on Human Rights Opportunities, 232 Conn. 91, 115 (1995). Accordingly, the court will only address the issue of whether the agency's decision was supported by substantial evidence in the record.
The plaintiff argues that the evidence in the record does not support the DMR's decision to deny him services because he meets the definition of mental retardation under General Statutes § 1-1g. He also claims that the scores on IQ tests and Adaptive Skills Tests indicate that he meets the definition of mental retardation as defined in § 1-1g. The plaintiff also argues that the DMR's decision to deny him services is based on criteria which is not included in § 1-1g. According to the plaintiff, the DMR relied upon subjective and irrelevant information to CT Page 5741-dq determine that he is not eligible for services. He also argues that the DMR cannot rely on additional criteria that is not included in the list of criteria in § 1-1g. The plaintiff contends that the hearing officer improperly relied on testimony of witnesses for the DMR and reached an erroneous conclusion that he is not eligible for DMR services. The plaintiff urges the court to reverse the final decision of the DMR and find that he is eligible for DMR services.
The DMR counters that "judgment and interpretation are particularly required in the application of the definition [in § 1-1g] when, as in this case, there are mixed results on standardized intellectual testing and the presence of confounding variables, diagnoses, and other factors which may depress I.Q. scores." (Defendant's Brief, p. 4.) The DMR argues that, although the record contains competing evidence, this does not create a clearly erroneous decision which is not supported by substantial evidence on the record. The DMR contends that the hearing officer and the commissioner are entitled to rely on the testimony of Dr. Tom Morgan because he is a licensed psychologist employed by the DMR and he "is equipped to provide an assessment of the meaning of the mixed intelligence scores as well as the confounding variables." (Defendant's Brief, p. 5.) The DMR argues that the court should sustain the decision because it is supported by substantial evidence on the record.
Section 17a-212-2(b) of the Regulations of Connecticut State Agencies provides criteria for determining eligibility for services from the DMR. "A person who is: (1) a resident of the State of Connecticut, and (2) has mental retardation is eligible for services of the department." Regs., Conn. State Agencies § 17a-212-2 (b). Section 17a-212-1 (i) of the Regulations of Connecticut State Agencies provides, in pertinent part, that "`mental retardation' means mental retardation as defined in Sec. 1-1g
CGS. . . ."
General Statutes § 1-1g (a) provides, in pertinent part, that "mental retardation means a significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." General Statutes § 1-1g
(b) provides, in pertinent part, that "`general intellectual functioning' means the results obtained by assessment with one or more of the individually administered general intelligence tests developed for that purpose and standardized on a significantly adequate population and administered by a person or persons formally trained in test administration; `significantly subaverage' means an intelligence quotient more than two standard deviations below the mean for the test; `adaptive behavior' means the effectiveness or degree with which an individual CT Page 5741-dr meets the standards of personal independence and social responsibility expected for the individual's age and cultural group; and `developmental period' means the period of time between birth and the eighteenth birthday."
The issue in dispute is whether the plaintiff demonstrates significantly subaverage general intellectual functioning as defined in General Statutes § 1-1g. According to the DMR, significantly subaverage general intellectual functioning is demonstrated by a measured I.Q. of less than 70. (ROR, Volume II, R-15, p. 72.) In 1994, 1996, 1997 and 1999, the Wechsler Intelligence Scale for Children-Third Edition (WISC-III) was administered to the plaintiff to determine his level of cognitive functioning. The first test, administered in 1994, placed the plaintiff in the low to average range of intelligence with a verbal I.Q. of 92, a performance I.Q. of 82, and a full scale I.Q. of 86. (ROR, Volume II, R-21, p. 89.) In 1996, the plaintiff received the following scores on the test: a verbal I.Q. of 74, a performance I.Q. of 64 and a full scale I.Q. of 67. (ROR, Volume II, R-19, p. 80.) On the test administered in 1997, the plaintiff achieved a verbal I.Q. of 72, a performance I.Q. of 68 and a full scale I.Q. of 68. (ROR, Volume II, R-20, p. 85.) The examiner noted that "validity of the scores he obtained would appear compromised." (ROR, Volume II, R-20, p. 85.) The examiner also determined that "it would appear that social and emotional difficulties significantly interfere with his cognitive reasoning." (ROR, Volume II, R-20, p. 87.)
The most recent test was administered by Christine McNaney on September 8, 1999. On this test, the plaintiff achieved a verbal I.Q. of 79, a performance I.Q. of 55 and a full scale I.Q. of 65. (ROR, Volume II, R-4, Item E, p. 31.) McNaney determined that the plaintiff's scores "[placed] him in the Mildly Mentally Retarded Range of measured intelligence." (ROR, Volume II, R-4, Item E, p. 33.) McNaney further stated that "he clearly meets criteria for a diagnosis of Mild Mental Retardation." (ROR, Volume II, R-4, Item E, p. 33.) Prior to McNaney's diagnosis, the plaintiff was not diagnosed with mental retardation.
At the hearing on September 16, 1999, the hearing officer heard testimony from Tom Morgan, a psychologist employed by the DMR and from Christine McNaney, a psychologist retained by the plaintiff. Morgan testified at the administrative hearing that the most recent test did not meet the criteria in § 1-1g because "[w]e have a verbal IQ of 79 and we have a score that is 24 points lower than that on the performance that's 55. And we never look at a full-scale score when significant differences like 10, 15, 12ish and once you get more than that difference CT Page 5741-ds you don't look at the average of them, you look at the separate scores. And again it kind of confirms that you have a person who is functioning well above an MR range in their verbal skills." (ROR, Volume III, R-24, p. 111.) Additionally, Morgan emphasized the variation in the plaintiff's subtest scores, stating that "[h]e had an information subtest of 7, which even being low it was still well above what you would consider mentally retarded. Along with that, what jumped out was that he had a vocabulary score of 1. . . . if you take it at face value, he's using words at a moderately retarded level. However, he's answering information questions and learning at a level that gives him an information subtest score of 7. That would imply that before I even read the comments of the person providing the information, that the global scores are not accurate estimates, that something else that's going on in addition to just intellectual things." (ROR, Volume III, R-24, p. 101.)
Morgan also emphasized that "looking over his other records, there was indication that he has had diagnoses of attention deficit hyperactivity disorder, obsessive compulsive disorder, positional defiant disorder[1], psychotic disorder not otherwise specified, and learning disorder not otherwise specified. Any one of those would account for why the intelligence level that he demonstrated at age seven was now being underestimated by his performance, both on tests and in life."[2]
(ROR, Volume III, R-24, p. 101.) McNaney disagreed with Morgan, who had attributed most of the plaintiff's compromised intellectual functioning to his numerous emotional and psychiatric disorders. McNaney emphasized that the DSM-IV[3] "does say that there are no mutually exclusive diagnoses that you can have numerous at the same time." (ROR, Volume III, R-24, p. 109.) Despite McNaney's testimony, Morgan maintained that "if there are other primary causes, you give both diagnoses, but you don't deal with the mental retardation as the primary diagnosis." (ROR, Volume III, R-24, p. 111.) Morgan emphasized that if the primary causes are addressed "the expectation would be that the mental retardation wouldn't still be there." (ROR, Volume III, R-24, p. 111.)
The psychologists at the DMR found that the plaintiff did not meet the § 1-1g criteria based on his higher verbal scores and the existence of various social, psychiatric and emotional disorders. The DMR is the agency entrusted with determining eligibility for services and thus they are uniquely qualified to interpret intelligence tests and determine whether the criteria of General Statutes § 1-1g is satisfied. The substantial evidence shows that the plaintiff consistently achieves a much higher verbal I.Q. than performance I.Q. His verbal I.Q. clearly exceeds the scores necessary to make a finding of mental retardation, however, his performance and full scale scores fall below 70. CT Page 5741-dt Additionally, the most recent test actually showed an increase in his verbal I.Q. scores.
There are numerous federal cases dealing with appeals by claimants who have been denied disability benefits from the Social Security Administration on the basis that the individual does not meet the criteria for a diagnosis of mental retardation. The cases are instructive because the criteria used by the Social Security Administration for determining whether an individual is mentally retarded is very similar to the criteria in General Statutes § 1-1g.[4] In a recent case from the District Court of Arkansas, the court stated that "[w]hen there is significant scatter in the subtest scores, the profile of the strengths and weaknesses, rather than the mathematically derived full-scale IQ, will more accurately reflect the person's learning abilities. When there is a marked discrepancy across verbal and performance scores, averaging to obtain a full-scale IQ can be misleading." Anderson v. Apfel,996 F. Sup. 869, 873 (E.D.Ark. 1998). Accordingly, the court finds that it was proper for the DMR to look at the individual scores rather than rely on the full scale I.Q. because of the discrepancy between the plaintiff's verbal I.Q. and performance I.Q.
Morgan testified that the difference in scores indicates that something else is affecting the plaintiff's cognitive functioning and the record contains evidence supporting the DMR's finding that the plaintiff's multiple disorders affected his ability to perform on the tests. Despite the plaintiff's claims that General Statutes § 1-1g does not allow the DMR to consider criteria not listed in the statute, there is legal support for the DMR's contention that other factors may be taken into consideration when interpreting test scores. "The choice of testing instruments and interpretation or results should take into account factors that may limit test performance (e.g. the individual's sociocultural background, native language, and associated communicative, motor, and sensory handicaps.)" Anderson v. Apfel, supra, 996 F. Sup. 873. Accordingly, it was reasonable for the DMR to consider the other factors that may have affected the plaintiff's test scores.
The court is aware that some of the evidence in the record suggests that the plaintiff meets the criteria for a diagnosis of mental retardation. Unfortunately, there is also evidence that the plaintiff's cognitive functioning may be affected by his psychiatric, social and emotional problems. The court is not equipped to interpret test scores or to determine the effect various disorders would have on an individual's cognitive functioning. "Whether a claimant meets or equals a listed impairment is strictly a medical determination." Colavito v. Apfel, CT Page 5741-du75 F. Sup.2d 385, 403 (E.D.Pa. 1999). Additionally, the fact that doctors may disagree on whether an individual is mentally retarded, does not render the decision by the DMR arbitrary, capricious, illegal or an abuse of discretion. "Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the [agency] not the courts." Hall ex rel. Lee v.Apfel, supra, 122 F. Sup.2d 963. "The question is not whether the trial court would have reached the same conclusion but whether the record before the [FHO] supports the action taken." Hospital of St. Raphael v.Commission of Hospitals and Health Care, 182 Conn. 314, 318 (1980). Accordingly, the court, having searched the entire record, finds that there exists substantial evidence to support the FHO's findings of fact and conclusions.
 VI Conclusion
For all of the foregoing reasons, the agency's decision is affirmed and the plaintiff's administrative appeal is hereby dismissed.
BY THE COURT,
Peter Emmett Wiese, Judge